# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

JOHN D. WALKER, Derivatively on
Behalf of TEXTRON, INC.,

        Plaintiff,

      v.

LEWIS B. CAMPBELL, TED R.
FRENCH, KATHLEEN M. BADER, R.
KERRY CLARK, PAUL E. GAGNE,
DAIN M. HANCOCK, JAMES L.
ZIEMER, IVOR J. EVANS, LAWRENCE
K. FISH, JOE T. FORD, LORD POWELL
OF BAYSWATER KCMG, and THOMAS
B. WHEELER,

        Defendants,

      v.

TEXTRON, INC., a Delaware corporation,

        Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

**CA09- 556 ML**

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
VIOLATIONS OF THE SECURITIES
EXCHANGE ACT OF 1934, BREACH OF
FIDUCIARY DUTY, WASTE OF
CORPORATE ASSETS AND UNJUST
ENRICHMENT**

<u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

**Page**

I.    NATURE AND SUMMARY OF THE ACTION ................................................1

II.   JURISDICTION AND VENUE ....................................................................2

III.  THE PARTIES.................................................................................................3

    A.    Plaintiff Shareholder ............................................................................3

    B.    Nominal Defendant Textron ................................................................4

    C.    Individual Defendants .........................................................................4

          1.    Defendant Campbell – Director, CEO, and Insider Seller ...........4

          2.    Defendant French – CFO ...........................................................6

          3.    Defendant Bader – Director and Audit Committee Member .......7

          4.    Defendant Clark – Director and Audit Committee Member........7

          5.    Defendant Gagne – Director and Audit Committee Chairman....8

          6.    Defendant Hancock – Director and Audit Committee Member ..8

          7.    Defendant Ziemer – Director and Audit Committee Member.....8

          8.    Defendant Evans – Director ........................................................9

          9.    Defendant Fish – Director ..........................................................9

          10.   Defendant Ford – Director .........................................................9

          11.   Defendant Powell – Director.....................................................10

          12.   Defendant Wheeler – Director ..................................................10

          13.   "Director Defendants" ...............................................................10

          14.   "Officer Defendants" ................................................................10

          15.   "Audit Committee Defendants" ................................................10

IV.  DUTIES OF THE INDIVIDUAL DEFENDANTS ......................................11

    A.    Fiduciary Duties ................................................................................11

    B.    Audit Committee Duties ....................................................................11

C.      Control, Access, and Authority....................................................12

D.      Reasonable and Prudent Supervision........................................13

E.      Breach of Duties.............................................................................14

V.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ...............15

VI.    FACTUAL BACKGROUND AND OVERVIEW .........................................17

VII.   THE IMPROPER BUYBACK .........................................................18

VIII.  FALSE AND MISLEADING STATEMENTS .........................................19

A.      False and Misleading Second Quarter 2007 Statements .......................20

B.      False and Misleading Third Quarter 2007 Statements.........................20

C.      False and Misleading Fourth Quarter 2007 Statements .......................21

D.      False and Misleading First Quarter 2008 Statements .........................27

E.      False and Misleading Second Quarter 2008 Statements .......................28

F.      False and Misleading Third Quarter 2008 Statements.........................31

IX.    THE TRUTH IS REVEALED .........................................................33

X.     DAMAGES TO TEXTRON CAUSED BY THE INDIVIDUAL DEFENDANTS ..........34

XI.    INSIDER SALES BY DEFENDANT CAMPBELL .....................................35

XII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ...........................42

A.      Demand Futility as to Defendant Campbell.....................................43

B.      Demand Futility as to the Audit Committee ...................................44

C.      Demand Futility as to All Director Defendants .................................44

COUNT I  Derivatively Against Defendants Campbell and French for Violation of §10(b)
         of the Exchange Act and Rule 10b-5 Promulgated Thereunder .........................47

COUNT II  Derivatively Against the Director Defendants for Violation of §20(A) of the
         Exchange Act........................................................................49

COUNT III  Against Defendants Campbell and French for Breach of Fiduciary Duties of
         Due Care, Loyalty and Good Faith .....................................................50

COUNT IV   Against the Audit Committee Defendants for Breach of the Fiduciary
    Duties of Loyalty and Good Faith.................................................................................51

COUNT V   Against Defendants Campbell, Bader, Clark, Evans, Fish, Ford, Gagne,
    Hancock, Powell, Wheeler, and Ziemer for Breach of the Fiduciary Duties of
    Loyalty and Good Faith................................................................................................52

COUNT VI   Against All Defendants for Waste of Corporate Assets...........................................54

COUNT VII   Against All Defendants for Unjust Enrichment......................................................55

PRAYER FOR RELIEF.................................................................................................................55

XIII.   JURY DEMAND...............................................................................................................57

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## I.   NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of Textron, Inc. ("Textron" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of federal and state law, including violations of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, violations of §20(a) of the Exchange Act, breaches of fiduciary duties, waste of corporate assets and unjust enrichment that have caused substantial monetary losses to Textron and other damages, such as to its reputation and goodwill.

2.     Textron operates in the aircraft, industrial, and finance businesses. During 2007 and 2008, Textron's business faced an undisclosed material risk represented by declining demand for the Company's aircraft and industrial products due to the economic downturn. This economic downturn, which was widely predicted by economists, took effect during December 2007. Defendants sought to conceal Textron's exposure to the downturn by making and authorizing Textron to make false and misleading statements that misled the Company's shareholders into believing that the Company's backlog would insulate it from the downturn.

3.     Indeed, beginning in July 2007 and continuing to November 2008, defendants falsely assured Textron's shareholders that, despite the economic downturn, they saw "continued uninterrupted growth" well into the next decade based upon an "unprecedented expansion of output" and Textron's "unprecedented backlog." On the surface, defendants' statements appeared to have merit because between July 2007 and October 2008, Textron's backlog grew from $14 billion to $23.5 billion. And defendants attempted to lend further credence to this "large and robust backlog"

with claims that Textron required that its buyers provide a nonrefundable deposit and an explanation as to the source of particular buyer's financing before orders were included in the backlog.

4.      In truth, however, as defendants' knew, Textron's backlog would not insulate the Company from the economic downturn because it was subject to the risk that customers would cancel or defer orders.  Beginning in November 2008, the truth regarding these cancellations and deferrals came out when defendants admitted that customers were delaying purchases because of "trouble getting financing."  These disclosures directly contradicted defendants' earlier assurances that Textron had required its customers to provide solid evidence of financing.

5.      Because of the cancellations and deferrals, between Textron's fiscal fourth quarter 2008 and its fiscal second quarter 2009, the Company's "unprecedented" backlog rapidly deflated from $23.2 billion to $16.1 billion.

6.      When the truth came out, Textron's market capitalization declined by over $2.3 billion as the Company's share price, which had been artificially inflated, declined rapidly.  Before this decline however, Textron's board of directors ("Board") forced Textron to repurchase over $608 million of the Company's shares at artificially inflated prices.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act.

8.      This Court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(3) in that plaintiff and defendants are citizens of different states and citizens or subjects of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Textron maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Textron, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   THE PARTIES

### A.     Plaintiff Shareholder

13.     Plaintiff John D. Walker was a shareholder of Textron at the time of the continuing wrong complained of.   The continuing wrong included the issuance of false and misleading statements regarding Textron's backlog and business prospects to artificially inflate Textron's stock price during July 2007 to November 2008.  Plaintiff was also a shareholder of Textron at the time of

certain of the improper repurchases of Textron's shares to further inflate Textron's stock price during the third fiscal quarter 2008. Once the plaintiff became a shareholder, he has continuously been a shareholder. Plaintiff is a citizen of Florida.

**B.     Nominal Defendant Textron**

14.     Nominal defendant Textron is a Delaware corporation with its principal executive offices located at 40 Westminster Street, Providence, Rhode Island.

**C.     Individual Defendants**

**1.     Defendant Campbell – Director, CEO, and Insider Seller**

15.     Defendant Lewis B. Campbell ("Campbell") is Textron's Chief Executive Officer ("CEO") and has been since July 1998. Campbell is also Textron's Chairman of the Board and has been since 1999 and a director and has been since 1994. Campbell was Textron's President from 2001 to January 2009 and from 1994 to 1999; Chief Operating Officer from 1992 to July 1998; and Executive Vice President from 1992 to 1994. Defendant Campbell is a citizen of Michigan. Textron paid Campbell the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $1,100,000 | $6,286,534 | $2,223,573 | $617,980 | $473,434 | $650,842 |
| 2007 | $1,100,000 | $8,436,661 | $2,229,762 | $2,200,000 | $9,839,709 | $588,996 |
| 2006 | $1,100,000 | $9,214,495 | $537,443 | $2,072,653 | $10,156,005 | $590,437 |

16.     Defendant Campbell knowingly or recklessly made false statements regarding Textron's backlog and business prospects. Defendant Campbell also authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of the false and misleading statements regarding Textron's business prospects and backlog.

17.     Additionally, Campbell misappropriated material non-public information regarding Textron's business prospects and backlog and sold 726,249 shares of Textron stock for $47,185,741.96 while in possession of that material non-public information. The following illustrates Campbell's sales between July 19, 2007 and November 5, 2008 (the "Suspicious Sales Period"), the period during which Textron's share price was artificially inflated due to false and misleading statements regarding Textron's business prospects and backlog:



### 2.   Defendant French – CFO

18.     Defendant Ted R. French ("French") was Textron's Executive Vice President and

Chief Financial Officer ("CFO") from December 2000 to February 2009.   Defendant French

knowingly or recklessly made false statements regarding Textron's backlog and business prospects.

Textron paid French the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation | All Other Compensation |
|---|---|---|---|---|---|---|

|      |          |             |           |             | Earnings    |           |
|------|----------|-------------|-----------|-------------|-------------|-----------|
| 2008 | $700,000 | $1,630,817  | $697,218  | $294,945    | $1,485,373  | $221,223  |
| 2007 | $700,000 | $1,959,412  | $687,683  | $1,050,000  | $1,560,164  | $224,077  |
| 2006 | $700,000 | $1,912,464  | $535,616  | $989,221    | $1,805,582  | $251,708  |

Defendant French is a citizen of Michigan.

### 3.    Defendant Bader – Director and Audit Committee Member

19.    Defendant Kathleen M. Bader ("Bader") is a Textron director and has been since 2004. Bader is also a member of Textron's Audit Committee and has been since at least March 2007. Defendant Bader knowingly or recklessly: (i) reviewed and approved false statements regarding Textron's business prospects and backlog; and (ii) authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's business prospects and backlog. Defendant Bader is a citizen of Michigan.

### 4.    Defendant Clark – Director and Audit Committee Member

20.    Defendant R. Kerry Clark ("Clark") is a Textron director and has been since 2003. Clark is also a member of Textron's Audit Committee and Organization and Compensation Committee as has been since at least March 2007. Defendant Clark knowingly or recklessly: (i) reviewed and approved false statements regarding Textron's business prospects and backlog; and (ii) authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's business prospects and backlog. Defendant Clark is a citizen of Ohio.

### 5.    Defendant Gagne – Director and Audit Committee Chairman

21.    Defendant Paul E. Gagne ("Gagne") is a Textron director and has been since 1995. Gagne is also Chairman of Textron's Audit Committee and has been since at least March 2007. Defendant Gagne knowingly or recklessly: (i) reviewed and approved false statements regarding Textron's business prospects and backlog; and (ii) authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's business prospects and backlog. Defendant Gagne is a citizen of Canada.

### 6.    Defendant Hancock – Director and Audit Committee Member

22.    Defendant Dain M. Hancock ("Hancock") is a Textron director and has been since 2005. Hancock is also a member of Textron's Audit Committee and has been since at least March 2007. Defendant Hancock knowingly or recklessly: (i) reviewed and approved false statements regarding Textron's business prospects and backlog; and (ii) authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's business prospects and backlog. Defendant Hancock is a citizen of Texas.

### 7.    Defendant Ziemer – Director and Audit Committee Member

23.    Defendant James L. Ziemer ("Ziemer") is a Textron director and has been since March 2007. Ziemer is also a member of Textron's Audit Committee and has been since March 2007. Defendant Ziemer knowingly or recklessly: (i) reviewed and approved false statements regarding Textron's business prospects and backlog; and (ii) authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result

of false and misleading statements regarding Textron's business prospects and backlog. Defendant Ziemer is a citizen of Wisconsin.

### 8. Defendant Evans – Director

24.     Defendant Ivor J. Evans ("Evans") is a Textron director and has been since 2003. Evans is also a member of Textron's Organization and Compensation Committee and has been since at least March 2007. Defendant Evans knowingly or recklessly authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's business prospects and backlog. Defendant Evans is a citizen of South Carolina.

### 9. Defendant Fish – Director

25.     Defendant Lawrence K. Fish ("Fish") is a Textron director and has been since 1999. Defendant Fish knowingly or recklessly authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's business prospects and backlog. Defendant Fish is a citizen of Massachusetts.

### 10. Defendant Ford – Director

26.     Defendant Joe T. Ford ("Ford") is a Textron director and has been since 1998. Defendant Ford knowingly or recklessly authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's business prospects and backlog. Defendant Ford is a citizen of Texas.

### 11.    Defendant Powell – Director

27.    Defendant Lord Powell of Bayswater KCMG ("Powell") is a Textron director and has been since 2001. Powell is also Chairman of Textron's Organization and Compensation Committee and has been since at least March 2007. Defendant Powell knowingly or recklessly authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's business prospects and backlog. Defendant Powell is a citizen of England.

### 12.    Defendant Wheeler – Director

28.    Defendant Thomas B. Wheeler ("Wheeler") is a Textron director and has been since 1993. Defendant Wheeler knowingly or recklessly authorized the repurchase of shares and failed to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's business prospects and backlog. Defendant Wheeler is a citizen of Massachusetts.

### 13.    "Director Defendants"

29.    The defendants identified in ¶¶15, 19-28 are referred to herein as the "Director Defendants."

### 14.    "Officer Defendants"

30.    The defendants identified in ¶¶15, 18 are referred to herein as the "Officer Defendants."

### 15.    "Audit Committee Defendants"

31.    The defendants identified in ¶¶19-23 are referred to herein as the "Audit Committee Defendants."

32.     Collectively, the Director Defendants, the Officer Defendants, and the Audit Committee Defendants are referred to herein as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

33.     By reason of their positions as officers, directors, and/or fiduciaries of Textron and because of their ability to control the business and corporate affairs of Textron, the Individual Defendants owed Textron and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Textron in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Textron and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.     Each director and officer of the Company owes to Textron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information. During 2007 and 2008, the Board met twenty-seven times.

### B.     Audit Committee Duties

35.     In addition to these duties, the Audit Committee Defendants owed specific duties, under its charter in effect during 2007 and 2008, to Textron to review and approve earnings press releases and statements made during earnings conference calls. During 2007 and 2008, the Audit

Committee met twenty-two times. In particular, the Audit Committee's charter in effect during 2007 and 2008 provided as follows:

> The purpose of the Committee shall be to (a) assist the Board of Directors with its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications and independence, and (iv) the performance of the Company's internal audit function and independent auditor, and (b) prepare the audit committee report that SEC rules require be included in the Company's annual proxy statement.

> In furtherance of this purpose, the Committee shall have the following duties and responsibilities:

> \* \* \*

> To discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies with management and the independent auditor, as appropriate.

**C.   Control, Access, and Authority**

36.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Textron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

37.   In particular, defendants Clark, Evans, Powell, and Trotter as members of Textron's Organization and Compensation Committee had and continue to have control and authority over Textron's executives because they had the authority under their charter to review and approve executive compensation. Specifically, the current Organization and Compensation Committee charter provides as follows:

> The purpose of the Committee shall be to: (i) approve compensation arrangements, including merit salary increases and any annual and long-term incentive compensation, with respect to the Chief Executive Officer and other executive officers of the Company; (ii) oversee and, where appropriate, approve

compensation arrangements applicable to other corporate officers who are not executive officers and business unit presidents; (iii) amend any, except where applicable laws, regulations, or stock exchange rules would require that the amendment be approved by the Board or by the Company's stockholders; (iv) administer the executive compensation plans and nonqualified deferred compensation plans of the Company and its subsidiaries; (v) approve the Chief Executive Officer and other executive officers' responsibilities and performance against pre-established performance goals; and (vi) plan for the succession of the Company's management.

38.     Because of their advisory, executive, managerial, and directorial positions with Textron, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Textron, including the size and quality of the Company's backlog and the Company's business prospects.

39.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Textron, and was at all times acting within the course and scope of such agency.

**D.     Reasonable and Prudent Supervision**

40.     To discharge their duties, the officers and directors of Textron were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Textron were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's backlog and business prospects;

(e)     remain informed as to how Textron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules and regulations.

**E.     Breach of Duties**

41.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Textron, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Textron's Board.

42.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its business prospects and the size and quality of its backlog, as detailed herein below, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of securities laws. As a result, Textron has expended, and will continue to expend, significant sums of money.

## V.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects and the size and quality of its backlog; (ii) enhance the Individual Defendants' executive and directorial positions at Textron and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) facilitate defendant Campbell's illicit sale of $47 million of his personally held shares while in possession of material non-public information; and (iv) deceive the investing public, including shareholders of Textron, regarding the Individual Defendants' management of Textron's operations, the Company's financial health and stability, and its future business prospects that had

been misrepresented by defendants. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

45.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to conceal the true fact that the Company's backlog would not insulate the Company's earnings from the economic downturn because the backlog was subject to a material risk of cancellations and deferrals.

46.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and to facilitate the sale of over $47 million of personally held shares.

47.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## VI.   FACTUAL BACKGROUND AND OVERVIEW

49.    Textron operates in the aircraft, industrial, and finance businesses. The Company has five operating segments: (i) Cessna Aircraft Company ("Cessna"), which manufactures aircraft; (ii) Bell Helicopter ("Bell"), which manufactures helicopters; (iii) Textron Systems, which provides supplies to the defense, aerospace, and general aviation markets; (iv) the industrial segment; and (v) Textron Financial Corporation.

50.    Cessna accounts for approximately 40% of the Company's revenues, while Bell accounts for approximately 20%.

51.    Because approximately 60% of the Company's revenues came from Cessna and Bell, the Individual Defendants paid particular interest to those segments as well as the material risks that the Company faced by doing business in those segments.

52.    According to Textron's fiscal 2007 Form 10-K filed February 20, 2008, one of the material risks that defendants focused on was the risk of cancellations and deferrals of customer orders resulting from weak economic conditions. In particular, the Form 10-K disclosed as follows:

> **Delays in aircraft delivery schedules or cancellation of orders may adversely affect our financial results.**
>
> Aircraft customers, including sellers of fractional share interests, may respond to *weak economic conditions* by delaying delivery of orders or canceling orders. Weakness in the economy may result in fewer hours flown on existing aircraft and, consequently, lower demand for spare parts and maintenance. Weak economic conditions also may cause reduced demand for used business jets or helicopters. We may accept used aircraft on trade-in that would be subject to fluctuations in the fair market value of the aircraft while in inventory. ***Reduced demand for new and used aircraft, spare parts and maintenance can have an adverse effect on our financial results of operations***.

53.    As alleged below, throughout 2007 and 2008, Textron's public statements as well as defendants Campbell's and French's statements attempted to downplay the risk of cancellations and

deferrals.  These risks were substantial during 2007 and 2008 when a severe economic downturn prompted many of Textron's customers to cancel and defer orders.

54.     The risks were further downplayed when, in July 2007, the Director Defendants authorized the significant repurchase of Company stock.  The repurchase authorization and the continued actual repurchase of shares under that authorization during July 2007 through September 2008 improperly suggested that the Company expected continued growth due to its purportedly strong backorders.

55.     Indeed, as early as March 6, 2007, *Bloomberg* published an article quoting former chairman Alan Greenspan as stating that there was a "one-third probability" of a U.S. recession that year.  On April 11, 2007, the *Los Angeles Times* published an article in which sixty percent of respondents to a poll said they believed that a recession was somewhat or very likely during 2007. During December 2007, these early predictions came true when the United States entered a severe economic downturn.

56.     The economic downturn resulted in declining demand for Textron's products and eventually led to the cancellations and deferrals predicted in the above-mentioned fiscal 2007 Form 10-K.  Nevertheless, in the false and misleading statements alleged below, Textron misled investors into believing that the Company's record backlog would insulate the Company from the cancellation and deferral risk.  Defendants Campbell and French personally made many of these statements during earnings conference calls.  The Audit Committee Defendants reviewed and approved these statements.

## VII.   THE IMPROPER BUYBACK

57.     On July 19, 2007, the Board authorized a share repurchase plan under which the Company was authorized to repurchase up to 24 million shares of its own stock.  Under this plan,

during July 2007 through September 2008, while Textron's stock was artificially inflated due to the false and misleading statements below, the Director Defendants authorized and failed to halt the buyback of over $608 million worth of Textron's stock at an average price of approximately $46.84 per share, which is substantially higher than Textron's current share price of less than $20 per share (yet lower than the $64.97 per share that the defendant Campbell averaged in selling his own Textron stock holdings).

58.     In particular, during the third quarter 2007 that ended on September 29, 2007, Textron repurchased 1,341,000 shares at an average price per share of $56.57 for an aggregate cost of $75.8 million. During the first quarter 2008 that ended on March 29, 2008, Textron repurchased 1,646,000 shares at an average price per share of $58.11 for an aggregate cost of $95.6 million. During the second quarter 2008 that ended on June 28, 2008, Textron repurchased 1,886,000 shares at an average price per share of $50.14 for an aggregate cost of $94.5 million. Finally, during the third quarter 2008 that ended on September 27, 2008, Textron repurchased 8,113,910 shares at an average price per share of $42.18 for an aggregate cost of $342.2 million.

59.     In authorizing the buyback, the Director Defendants knowingly or recklessly wasted corporate assets because they directed the Company to repurchase its own shares at artificially inflated prices.

## VIII.  FALSE AND MISLEADING STATEMENTS

The following false and misleading statement issued between July 2007 and October 2008 constituted a continuing wrong against the Company. These statements wrongfully suggested that Textron's business prospects were strong despite the economic downturn. This continuing wrong was not complete until November 5, 2008 when defendant Campbell disclosed that Textron's record backlog was eroding due to customer cancellations and deferrals.

### A.    False and Misleading Second Quarter 2007 Statements

60.    On July 19, 2007, Textron issued an earnings press release announcing its financial results for its fiscal second quarter 2007. The press release announced the Board's authorization of the repurchase of up to 24 million shares. In the press release, defendant Campbell commented on the Board's decision stating: "'These actions by our Board demonstrate confidence in our ability to execute and underscore the company's commitment to value creation through a balanced strategy of growth and returning cash to the shareholder.'"

61.    The July 19, 2007 press release also announced that Textron had raised its earnings and cash flow guidance for fiscal 2007. Defendant Campbell commented: "'Given the strength of demand for our innovative products and our progress in execution improvement thus far, we are raising our earnings and cash flow outlook for the year.'"

62.    The July 19, 2007 press release also reported a $3.6 billion backlog for Bell and a $10.4 billion backlog for Cessna for a combined backlog exceeding $14 billion.

63.    The second quarter 2007 statements were false and misleading because they misled Textron's shareholders into believing that the Company's business prospects were strong despite the pending recession based upon the $14 billion backlog and the Board's authorization of the repurchase. The backlog was subject to substantial undisclosed risks that customers would cancel and defer orders when they lost access to financing. And the repurchase authorization directly contributed to Textron's shareholders' false belief that Textron expected continued earnings growth based upon its sizable backlog.

### B.    False and Misleading Third Quarter 2007 Statements

64.    On October 18, 2007, Textron issued an earnings press release for its fiscal third quarter 2007. In the press release, Textron increased its fiscal 2007 earnings guidance by $0.22 to

$3.40-$3.50 per share. In support of this increased guidance, the press release referred to 608 new orders for business jets and an "all-time high" Cessna backlog of $11.9 billion. According to the press release, Bell's backlog totaled $3.65 billion. Defendant Campbell stated in the press release: "'We see strong end-market demand continuing through the rest of the decade, which in concert with the benefits of our ongoing Transformation strategy, positions us to deliver significant growth in earnings, cash flow and shareholder value.'"

65.     Also on October 18, 2007, Textron hosted an investor conference call to discuss the fiscal third quarter 2007 earnings. During the call, defendant French commented that Textron "continue[s] to deliver very strong financial and operational performance which allows us to further increase our near term expectations and gives us ever-increasing confidence in our long-term outlook."

66.     The third quarter 2007 statements were false and misleading because they suggested that the Company's business prospects were strong despite the pending recession based upon the Company's "all-time high" backlog. Further, defendants Campbell and French falsely stated that the backlog reflected strong demand through the rest of the decade. These statements were false, however, because the backlog was subject to substantial undisclosed risks that customers would cancel and defer orders when they lost access to financing.

**C.     False and Misleading Fourth Quarter 2007 Statements**

67.     On January 24, 2008, Textron issued an earnings press release announcing its financial results for its fiscal fourth quarter 2007. The press release reported a 48% increase in Cessna's backlog, which had increased to $12.6 billion compared to $8.5 billion for fiscal 2006. In regards to fiscal 2008 earnings guidance, the release quoted defendant Campbell who commented that "While we expect softening and maybe even a temporary downturn in the U.S. economy in

2008, we believe we are particularly well positioned given our strong aircraft and military backlogs

…."

68.     Also on January 24, 2008, Textron hosted an investor conference call to discuss its

fiscal fourth quarter 2007 earnings.  During the call, defendant Campbell stated the following with

respect to Textron's business execution and outlook, which were positive despite the recession.

> Continuous systematic business improvement and operational execution are becoming the number one cultural identifier at Textron. Happily, as we look at our end market opportunities over the next five years, we see *tremendous growth potential* and we're committing the necessary capital to service this demand….
>
> At Bell, we're investing for an *unprecedented expansion of output* and we've made a significant amount of progress with the leadership and organizational capabilities there.

69.     During the same conference call, defendant Campbell also stated the following

regarding Textron's backlog, which he attributed to a "global expansion of demand."

> And if the value investing new products needed any validation, our *ending aircraft backlog of 16.4 billion, up 41% from a year ago, should be convincing*. On top of that, at systems we have a $2.4 billion backlog, plus we have $1 billion worth of Bell 429 customer purchase agreements not yet in backlog.
>
> So if you add all that together, we have nearly 20 billion in existing customer orders at Cessna, Bell and Systems. We expect the 429 will enter into the backlog after first production flight expected around midyear. We're targeting our first 429 delivery by the end of the year, or early 2009, and have a production ramp plan that goes to 60 units annually by 2011.
>
> Demand for commercial helicopters remains strong, as we booked 268 orders in '07, significantly higher than last year's deliveries of 181. And global demand for business jets also remains unprecedented. Cessna added another 164 orders in the fourth quarter, bringing the full year to 773 orders taken in 2007, an all time record and up from 496 orders in 2006.
>
> Now, clearly there are two major factors driving business jet orders. First, there's a *global expansion of demand* and the second is new models like our Sovereign, the CJ4 and the Mustang.

70.     During the same conference call, defendant Campbell stated that with respect to Cessna orders included in the backlog, binding contracts for Cessna orders include "nonrefundable initial deposits of $1 million each."  Specifically, Campbell stated the following:

> In fact, we've received a large number of advanced customer requests to be placed in the production queue. Each of these requests was accompanied by a $100,000 refundable deposit. With the official announcement, we'll be converting these indications of interest into binding contracts with nonrefundable initial deposits of $1 million each. And we expect to have at least 70 firm orders for the LCC by the end of this year.

> In fact, we're *expecting another banner year* of new orders at Cessna all around. Based on our current customer activity, our marketing plans, and assessment of the marketplace, we expect to book over 570 total jet orders this year, well above our delivery forecast of 470. Given that our delivery schedule is completely booked out well into 2009, and supported by the diversification of our order book, we expect *continued uninterrupted growth* at Cessna *well into the next decade*.

71.     During the same conference call, defendant Campbell stated the following regarding defendants' monitoring of the recession.  According to Campbell, he and other defendants "carefully modeled" three years worth of Textron deliveries taking into account cancellations and concluded that Textron would continued to have increasing deliveries in 2008 through 2010 despite the recession.  In particular, Campbell stated as follows:

> Now, let me change subjects for a minute. I want to make a few comments about our expected performance in the context of the current economic situation. We now know that U.S. corporate profits contracted in the third quarter of 2007, primarily driven by the financial sector, and economists expect continued softness through at least the first half of 2008. Obviously, this news and the likely fact that we're already in the U.S. economic downturn, are weighing heavily on the stock market.

> But I have to say that we're puzzled at Textron by the degree with which our shares have fallen compared to our peers in the market overall. We believe that a significant amount of our enterprise is *relatively unaffected by the economy, and that we are well-positioned for this environment*.

First, only a small portion of Bell Helicopter and Textron Systems is driven by the economy, so we expect growth at these business units will remain relatively uninterrupted.

At Cessna, we've analyzed the 2001, two, three, that period, that jet downturn, which was the worst down cycle we've ever experienced. And we *carefully modeled* our next three years' deliveries on the basis of annual percentage cancellations and percent reductions in new orders during that prior period, to really understand specifically how a similar downturn could affect our 2008 through 2010 delivery outlook. Even subjected to the severe 2003 scenario, our delivery outlook for 2008 and 2009 remains unaffected and we would expect 2010 to be no worse than flat with 2009.

Now, this is simply a function of the *unprecedented backlog* which currently stands at 1,418 units and compares to 811 units at the end of 2000. Yet keep in mind we do not believe the extreme 2003 scenario will repeat, in terms of cancellation rates or order in-take, because both our backlog and orders have been better diversified by customers, specifically we have less dependence on fractional and by market, with a significantly higher international mix.

Furthermore, the 2003 downturn was also magnified by the 9/11 disruption, that among other things halted business jet travel in 2001, placing unique uncertainty into the marketplace. *So in summary, we continue to have confidence in our increasing deliveries in 2008, 2009, and 2010, even given the current economic uncertainty.*

72.     During the same conference call, defendant French commented that despite uncertainty stemming from the recession, Textron had "good revenue visibility based on [its] solid growing backlogs …." In particular, French stated as follows:

Obviously, the U.S. economy is now weaker and it's certainly more uncertain. However, we have *good revenue visibility based on our solid growing backlogs*, plus we continue to observe positive forward signals in the business jet marketplace.

\*   \*   \*

Continued strength in orders gives us *conviction in our outlook*, as we now have another record Cessna backlog at 12.6 billion, that's up 4.1 billion or 48% from a year ago.

\*   \*   \*

Bell Helicopter's backlog was 3.8 billion at the end of the year, that's up 23% from 3.1 at the end of '06, benefiting from growth in both military and commercial