orders. Textron Systems' backlog was 2.4 billion, up from 1.3 last year, reflecting both the acquisition of AAI and growth in orders.

\* \* \*

***In closing, our outlook at Textron remains very positive. We're expecting strong growth again this year through the rest of this decade, and beyond****.*

73.    Later during the same call, an analyst with Credit Suisse questioned defendant Campbell regarding the quality of the backlog and whether he had "seen any cancellations at all or any kind of customer concerns about what's going on in the marketplace." Defendant Campbell responded that he "firmly believe[d] that [Textron would] be able to meet the numbers ...." In particular, Campbell responded as follows:

Okay. I think Nicole, I want to give you a really full answer on this one, because we have really looked hard at this topic because we knew what we wanted to say on the call this morning but we wanted to make darn sure. We have really ***scrubbed this data****.* So let me give you some facts.

Used aircraft, which is a pretty good precursor when it starts to go up, that things are going to slow down some, still remains at our low 10%. Keep in mind, the late model aircraft, five years and younger, are hard to get in the used aircraft market. So a lot of those aircraft will probably be sitting there for the rest of their lives. We have not seen any absorbable deterioration in customer orders. We have very low, actually I'd say almost ***unusually low cancellations*** versus normal years, so that's not there.

Net jet orders which need to be understood in the context of where they're being sold and why, net jet orders and Citation shares are still very good. Net jet U.S. orders primarily are for replacement, so that will continue. And then they've really grown strong in Europe and really picking up steam there. I mentioned order cancellations.

And then Jack and his team recently had a sales meeting kickoff out in the west, and the sales force is really bullish on what they see and the customers they've contacted.

Another interesting fact, which I find to be kind of cool, is that back in 2000, before we saw 9/11 and the downturn that ended up being just awful through 2003, our backlog for the next three years is now 82% higher than what the backlog was we had for the three-year period. So the three-year period, '01, '02, '03, we had 693 jets on order for delivery, and for '07, '08, '09, we have 1,260 on order. So about every

way we can look, you mentioned international versus domestic, that's also a strong point.

So I tell you, if there's something coming at us, we can't see it, and if it comes at us as hard as it did in '01, '02, '03, we firmly believe that we'll be able to meet the numbers that we talked about on the call here.

74.     Later during the same call, an analyst with Lehman Brothers asked defendant French to give "a little more flavor on what are the components" behind Textron's positive guidance. Defendant French responded that "what's really misunderstood is the depth and strength of [Textron's] backlog" and that he and the other defendants had "looked at every downturn in general aviation *since the second world war* ...." In particular, defendant French stated as follows:

> I think what's really misunderstood is the depth and strength of the backlog. We've taken this backlog and *torn it apart*, and we've modeled a scenario where order in-take rates fall -- and remember we've looked at every downturn in general aviation since the second world war, and this downturn post-9/11 is by far the worst of all of those.

> We've taken this existing backlog and we've gone back and modeled the rate of order falloff that we saw in the 2001, '2, '3 time frame, and it's pretty radical by the way, orders fell 68% in the first year, so down two-thirds, came back to being down about a third in the second year and got back to about even by the third year.

> So we've modeled that in. We've modeled the rate of cancellations, which in that last downturn were 160 some-odd over three years, but because our backlog is larger, we modeled a number twice that big into it. When you take that and take our production plans for '08, '09, and '10 which grow every year by the way, if that same event happens to us over that three-year period of time, we'll still end up with 20 months of backlog by the end of 2010. So it's just very, very deep, and I don't think that's well-understood.

75.     The fourth quarter 2007 statements were false and misleading because they suggested that the Company's business prospects were strong despite the pending recession based upon the Company's backlog. Further, defendants Campbell and French falsely claimed that they had carefully analyzed the "unprecedented" backlog based upon the recession and past economic downturn and determined that their projections of continued growth would be "relatively unaffected"

by the economy." These statements were false, however, because the backlog was subject to substantial undisclosed risks that customers would cancel and defer orders as a result of the economic downturn.

**D.    False and Misleading First Quarter 2008 Statements**

76.    On April 17, 2008, Textron issued an earnings press release announcing its fiscal first quarter 2008 financial results.  The press release reported a combined backlog at Cessna, Bell and Textron Systems of $22 billion compared to the $18.8 billion backlog at the end of fiscal 2007.  In regards to the backlog, defendant Campbell stated in the press release that "'Global demand continues to be brisk across our aircraft and defense businesses, which led to another significant expansion in our backlog during the quarter.'"

77.    Also on April 17, 2008, Textron hosted an investor conference call for analysts to discuss the first fiscal quarter 2008 earnings.  During the call, defendant French commented on Textron's $22 billion backlog and the excellent visibility that backlog provided in regards to projected earnings.  French stated the following:

> I want to start with a comment about our aircraft and defense backlog because as large as it is at $22 billion, with the V-22 multi-year, it is really over $26 billion if you allow for the unfunded portion of the contract, and on top of that keep in mind we have another billion in potential backlog for the Bell 429. So while we have to carefully navigate our way through the current economic challenges, we have *tremendous growth ahead of us with excellent visibility*.

78.    Later during the same call, an analyst with Credit Suisse asked defendant Campbell to explain whether Textron's backlog was affected by "an acceleration [of orders] in the U.S. [or] a deceleration?"  In response, defendant Campbell said that the backlog was supported by "exceptionally strong" order rate, which proved that "international and domestic customers really want our products." In particular, Campbell stated as follows:

I would say if you -- I would say it is pretty balanced actually. We didn't think it would come in that strong. Orders in total are stronger than we thought when we entered the year obviously, so the backlog number and the order rate is exceptionally strong and continues to prove that *both international and domestic customers really want our products*. What I found interesting, Nicole, to expand on that a little bit, is we usually get the question of what's the backlog look like? The backlog actually is split just about 50/50 international and domestic, so that's a good way of thinking about it, just coincidentally, and if you then take another look at it, small business, less -- smaller than Fortune 500 businesses add about 30% to that, and individuals including NetJets which is 10 plus individual buys which is about eight, so you have a good spread of desire across the U.S. constituencies, and then, I don't have the breakout of international, but as I said it is about half of our total backlog.

79.     The first quarter 2008 statements were false and misleading because they suggested that Textron's guidance was supported by strong demand as demonstrated by the Company's backlog. These statements were false because the backlog was subject to substantial undisclosed risks that customers would cancel and defer orders as a result of the economic downturn.

### E.     False and Misleading Second Quarter 2008 Statements

80.     On June 13, 2008, Textron issued a press release announcing that the Company was lowering its fiscal second quarter 2008 earnings guidance. Nevertheless, defendant Campbell stated in the press release that "2008 is shaping up to be another very good year for Textron overall as we continue to see strong demand and performance at Cessna, Bell and Textron Systems."

81.     On July 17, 2008, Textron issued a press release announcing its fiscal second quarter 2008 earnings. The press release reported a combined backlog from Cessna, Bell, and Textron Systems of $23.5 billion. Defendant Campbell commented in the press release that "global demand remained very strong and led to another record level of backlog."

82.     Also on July 17, 2008, Textron hosted an investor conference call to discuss its fiscal second quarter 2008 earnings. During the call, defendant Campbell acknowledged the economic downturn, but insisted that, due to the "size and resiliency" of Textron's backlog, he had confidence

in maintaining Textron's outlook for fiscal 2008.  In particular, defendant Campbell stated the following:

> You know, even in the midst of prevailing economic weakness and challenges in our Finance segment, we achieved another solid overall result this quarter, and we continue to build backlog for our future, which is also important. Before I dive into the details, I'd like to go back and review what our initial economic assumptions were coming into 2008. I'd say our world has changed a bit, huh? I want to update you now on how we're thinking about the balance of the year and beyond.
>
> In January, back then we were expecting modest world economic growth with commodity prices remaining at what was perceived to be, back then, pretty high levels. In the United States, credit and housing issues were expected to result in a mild downturn with soft corporate profits, at least mid year. Well, as we all know, since we first discussed our outlook, oil has been up by over $50 per barrel versus end of your last year, and other commodities are up significantly as well. This is having a direct impact on us through increased costs, particularly in our Industrial segment. Higher commodity costs have also further stressed the U.S. and global economies. Nonetheless, strong performance in our aircraft and defense businesses, *the size and resiliency of our backlog*, and actions we're taking give us the confidence to maintain our overall outlook for the rest of the year and beyond. A key point.

83.    During the same call, defendant Campbell stated further that Textron's backlog gave him "complete confidence" to project increased production and deliveries in 2009.  In particular, Campbell stated as follows:

> The point here is, this backlog gives us *complete confidence* to raise production next year and we're currently targeting about 535 jets for which we're 95% sold out already. The question now becomes, where do deliveries go from here in 2010 and 2011? Obviously the answer is the function of three things--our current backlog, where net order rates go over the next three years, and one's view of global long-term business jet demand.
>
> Let's start with the last factor, long-term demand. Over the past several years, we've witnessed a growth in international orders, which, in turn, is a result of early stage adoption of business jets in new markets around the world. We do not believe this phenomenon is temporary. In fact, we believe international market adoption rates will accelerate in concert with global economic expansion, particularly as the use of business jets continues to become more culturally acceptable, international infrastructures are built out, and sovereign policy barriers are eliminated. Based on

low existing penetration rates, our analysis suggests that global demand will grow to at least 700 Citation deliveries per year within five years. 700. Obviously the rate of adoption will be impacted by how the world economy evolves, but this level of demand is realistic with only modest assumptions about adoption rates.

84.     During the same call, defendant Campbell addressed the size and resiliency of Textron's backlog, including the risk that cancellation prompted by the economic downturn may erode the backlog. In sum, Campbell stated that he did "not view cancellations as a significant risk to [Textron's] outlook." In particular, Campbell stated as follows:

> Portions of our backlog are susceptible to normal cancellations or deferrals. And we'll likely see cancellations. However, within our backlog there's significant interest among customers to move up in their position and therefore *we do not view cancellations as a significant risk to our outlook*. So, in summary, even with the current global economic environment being what it is, we believe we'll have up delivery years in 2009 and again in 2010 and again in 2011.

85.     Later, during the same call, a Lehman Brothers analyst questioned defendant Campbell regarding whether or not he had seen any cancellation that made him cautious regarding the backlog. Defendant Campbell responded that there had been only two cancellations during the quarter that were not related to business failures. Rather, as defendant Campbell put it, the cancellations represented just a decision to "move something from year one to year two." In particular, Campbell responded as follows:

> I'll tell you, it's you know, with everything written, I'm going to be real frank with you. With everything that's been written about this time-I'll be real frank with you--with everything that's been written about the slow down in business jets and the cycles coming at us, we have had two--one, two--cancellations, and both of those have been discussed with customers, two of which said, can you do us a favor? These are not business failures, these are not guys that have gone bankrupt, they're not businesses that have gone underwater. These are two good customers of ours. We decided to move something from year one to year two. And, by the way, *it hasn't affected us a bit* because we have people ready to step up to take those jets. We really only have two this year to date. Very low number.

86.     The second quarter 2008 statements were false and misleading because they suggested that Textron's guidance was supported by a strong and resilient backlog and that the risk of cancellations was not significant.  These statements were false, however, because despite Campbell's statements to the contrary, the risk that cancellations and deferrals would erode the Company's backlog was substantial.

**F.     False and Misleading Third Quarter 2008 Statements**

87.     On October 16, 2008, Textron issued a press release announcing its fiscal third quarter 2008 earnings.   According to the press release, Textron's combined backlog remained at $23.5 billion during the quarter.  Commenting on the backlog and Textron's outlook, defendant Campbell stated in the press release that "The economic environment will continue to be uncertain over at least the next several quarters.  However, we believe the action we are taking, combined with our government programs and aircraft backlog, position us to perform well through these difficult times."

88.     Also on October 16, 2008, Textron hosted an investor conference call to discuss its fiscal third quarter 2008 earnings.  During the call, defendant Campbell again acknowledged the economic downturn, but insisted that, based upon "critical experience" related to the downturn in 2001, he "remain[ed] comfortable with next year's production plan at [that] point" and that he "continue[d] to have faith in a healthy long term systemic global demand ...."  In particular, Campbell stated as follows:

> The last down cycle which began in 2001 provided us with critical experience in managing in a down environment. *We are fortunate at this time to have that experience, but more importantly, to have a very large and robust backlog* of over 1500 jets which includes many customers who are interested in taking deliveries earlier, if they can. To develop a very specific and dynamic plan to maintain delivery

continuity, our Cessna team is contacting customers in the order book now so we can
be prepared early in the cycle in the case we need to move up delivers.

89.     Later during the same call, an analyst with Merrill Lynch asked defendant Campbell
whether he had "seen any evidence yet of any customers wanting to push out [or] wanting to defer"
their orders.  Campbell responded that "[c]ancellations are not even noteworthy."  In particular,
Campbell responded as follows:

> *One of the unusual things about this environment we're in is we just haven't seen*
> *too much of that yet. Cancellations are not even noteworthy.* We've had a few
> customers who have come and ask for different financing terms in the fourth quarter
> but basically we just haven't seen much movement as you might have expected by
> your question. So things are pretty steady at the moment.

90.     Later during the same call, an analyst with Morgan Stanley & Co. asked defendants
French and Campbell about the specific "financing requirements per customer so that you know if
they are fine for the 2009 planes."  In response, defendant French assured the analyst that "we are out
talking to them right now to try to understand if they may have issues."  Defendant Campbell added
that Textron required that its buyers provide a nonrefundable deposit and an explanation as to the
source of particular buyer's financing.  In particular, defendants French and Campbell responded as
follows:

> **[Defendant French:]**  We are out inquiring right now. We've had people come to us,
> but many of our customers finance with a variety of other sources, particularly our
> domestic customers who have historically had lots of other bank alternatives, but we
> are out talking to them right now to try to understand if they may have issues.

> **[Defendant Campbell:]**  When someone places an order, not only do they have to
> put down a ***nonrefundable deposit*** but also we require an understanding of ***where***
> ***they are going to get their financing***, and knowing that, then, that database is really
> valuable as we can then look across the entire spectrum of customers and then have
> some understanding which customers might have the most difficulty. We ***also know***
> ***their net worth***, et cetera, so we have a pretty good understanding about this.

91.     Later during the same call, an analyst with Macquarie Capital asked defendant Campbell for the basis for his comfort with respect to orders from international customers, which made up a substantial portion of the backlog.  Campbell in response reiterated that buyers had to provide Textron with a nonrefundable deposit and information regarding their source of financing. In particular, Campbell responded as follows:

> I can give you that in just a second. I have to find it. It's a big number, it's a good number. We have so many charts here. International orders and deliveries on the order side of 68% are international, and on the delivery side this year through the end of the quarter 57% are international. And if you look inside that and say where are they, Europe is by far the biggest. They're half of the international order backlog, and then Asia-Pacific is a little more than 10%, Middle East and Africa is a little less than 10%, Latin American is about 20-some percent. So it's a pretty darn good mix. And, of course, remember, every time we finance somebody, no matter where in the world we finance them, they have to come forward with that *nonrefundable deposit* and also *supply us with bank financing or whatever financing sources they have so we* can get convinced they are not speculating, and *also get convinced that they can make good on their order*. So I think it's a very good backlog right now.

92.     The third quarter 2008 statements were false and misleading because they suggested that Textron's guidance was supported by a large and robust backlog and that the risk of cancellations were not noteworthy.  Moreover, defendant Campbell's statements that customers had to provide Textron with their financing sources before orders were included in the backlog were misleading. These statements were false and misleading, among other reasons, because despite Campbell's assurances, Textron's customers did not have sufficient access to financing and, as a result, Textron's backlog was subject to a substantial risk of erosion from cancellations and deferrals.

## IX.     THE TRUTH IS REVEALED

93.     Then, a little less than three weeks later, on November 5, 2008, defendant Campbell revealed, at the Goldman Sachs Global Industrials Conference, that Textron's backlog was not as robust and resilient as he had claimed during the Company's earnings conference calls.  Indeed,

Campbell admitted that buyers were asking to delay their purchases by a quarter or two because of "trouble getting financing." These disclosures directly contradicted Campbell's earlier assurances during the October 16 conference call that Textron required buyers to "Supply [Textron] with bank financing" before orders were included in the backlog.

94.     On December 22, 2008, Textron issued a press release disclosing that it was reducing its fourth quarter manufacturing segment profit to a range of $300 to $330 million compared to the Company's previous expectation of $400 million. The press release attributed the reduction in guidance to "continued weakening in economic conditions" that was impacting customers.

95.     On January 29, 2009, Textron reported its fiscal fourth quarter and full year 2008 earnings. The press release disclosed that the combined backlog had declined by approximately $300 million. During an earnings conference call held on the same day, defendant Campbell attributed the backlog decline to 23 cancellations and an "unprecedented number of deferrals."

96.     Following these disclosures, Textron's share price declined from $18.64 per share on November 4, 2008 to $9.03 per share on January 30, 2009, which represents a market capitalization loss of $2.3 billion.

97.     As reported in Textron's first and second quarter 2009 financial results, the Company's backlog continued to shrink from mounting cancellations and deferrals from $23.2 billion (fourth quarter 2008) to $21.1 billion (first quarter 2009) and then to $16.1 billion (second quarter 2009.)

## X.     DAMAGES TO TEXTRON CAUSED BY THE INDIVIDUAL DEFENDANTS

98.     As a result of the Individual Defendants' wrongful conduct, Textron disseminated improper statements that misrepresented the Company's backlog and its business prospects. The improper statements have devastated Textron's credibility as reflected by the Company's $2.3 billion

market capitalization loss. Additionally, Textron is now the subject of several shareholder class action lawsuits alleging securities laws violations in connection with the misrepresentations regarding the Company's backlog and business prospects. The Company will face substantial costs in connection with these lawsuits.

99.     Further, as a direct and proximate result of the Individual Defendants' conduct, Textron has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred in connection with the $608 million stock buyback, including $342 million worth of shares repurchased during July to September 2008;

(b)     costs incurred in investigating and defending Textron and certain officers in the class action lawsuits, plus potentially billions of dollars in settlement or to satisfy an adverse judgment; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Textron.

100.     Moreover, these actions have irreparably damaged Textron's corporate image and goodwill. For at least the foreseeable future, Textron will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Textron's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XI.     INSIDER SALES BY DEFENDANT CAMPBELL

101.     As the CEO of Textron, defendant Campbell is a member of Company management. He is privy to material non-public information about the Company backlog. Defendant Campbell was responsible for his statements in earning press releases and statements in earnings conference

calls which included disclosures of the Company's backlog. Defendant Campbell engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's backlog that was not being disclosed to the shareholders.

102.   Defendant Campbell's sales were timed to maximize profit from Textron's artificially inflated stock price. In turn, Textron's stock price was artificially inflated as a result of Campbell's personal false statements. Specifically, Campbell made false and misleading statements that claimed that based upon an "all-time-high" backlog, Textron's business prospects were strong despite the economic downturn.

103.   Defendant Campbell made the following sales of his personally held Textron stock while he was in possession of material non-public information regarding the Company's backlog and business prospects.

| Reference No. | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| 1 | 7/20/2007 | 100 | $122.95 | $12,295.00 |
| 2 | 7/20/2007 | 100 | $122.94 | $12,294.00 |
| 3 | 7/20/2007 | 200 | $122.93 | $24,586.00 |
| 4 | 7/20/2007 | 300 | $122.91 | $36,873.00 |
| 5 | 7/20/2007 | 700 | $122.90 | $86,030.00 |
| 6 | 7/20/2007 | 500 | $122.89 | $61,445.00 |
| 7 | 7/20/2007 | 600 | $122.88 | $73,728.00 |
| 8 | 7/20/2007 | 200 | $122.87 | $24,574.00 |
| 9 | 7/20/2007 | 200 | $122.86 | $24,572.00 |
| 10 | 7/20/2007 | 400 | $122.85 | $49,140.00 |
| 11 | 7/20/2007 | 400 | $122.84 | $49,136.00 |
| 12 | 7/20/2007 | 79 | $122.83 | $9,703.57 |
| 13 | 7/20/2007 | 300 | $122.82 | $36,846.00 |
| 14 | 7/20/2007 | 800 | $122.81 | $98,248.00 |
| 15 | 7/20/2007 | 100 | $122.78 | $12,278.00 |
| 16 | 7/20/2007 | 200 | $122.71 | $24,542.00 |
| 17 | 7/20/2007 | 100 | $122.69 | $12,269.00 |
| 18 | 7/20/2007 | 100 | $122.68 | $12,268.00 |
| 19 | 7/20/2007 | 400 | $122.65 | $49,060.00 |
| 20 | 7/20/2007 | 100 | $122.64 | $12,264.00 |
| 21 | 7/20/2007 | 300 | $122.62 | $36,786.00 |

| Reference No. | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| 22 | 7/20/2007 | 100 | $122.57 | $12,257.00 |
| 23 | 7/20/2007 | 200 | $122.51 | $24,502.00 |
| 24 | 7/20/2007 | 300 | $122.49 | $36,747.00 |
| 25 | 7/20/2007 | 400 | $122.47 | $48,988.00 |
| 26 | 7/20/2007 | 200 | $122.45 | $24,490.00 |
| 27 | 7/20/2007 | 400 | $122.44 | $48,976.00 |
| 28 | 7/20/2007 | 500 | $122.42 | $61,210.00 |
| 29 | 7/20/2007 | 600 | $122.41 | $73,446.00 |
| 30 | 7/20/2007 | 1,800 | $122.40 | $220,320.00 |
| 31 | 7/20/2007 | 300 | $122.39 | $36,717.00 |
| 32 | 7/20/2007 | 400 | $122.38 | $48,952.00 |
| 33 | 7/20/2007 | 1,911 | $122.37 | $233,849.07 |
| 34 | 7/20/2007 | 600 | $122.36 | $73,416.00 |
| 35 | 7/20/2007 | 610 | $122.35 | $74,633.50 |
| 36 | 7/20/2007 | 100 | $122.34 | $12,234.00 |
| 37 | 7/20/2007 | 200 | $122.32 | $24,464.00 |
| 38 | 7/20/2007 | 700 | $122.31 | $85,617.00 |
| 39 | 7/20/2007 | 1,695 | $122.30 | $207,298.50 |
| 40 | 7/20/2007 | 1,800 | $122.28 | $220,104.00 |
| 41 | 7/20/2007 | 600 | $122.27 | $73,362.00 |
| 42 | 7/20/2007 | 1,400 | $122.26 | $171,164.00 |
| 43 | 7/20/2007 | 3,400 | $122.25 | $415,650.00 |
| 44 | 7/20/2007 | 700 | $122.24 | $85,568.00 |
| 45 | 7/20/2007 | 1,900 | $122.23 | $232,237.00 |
| 46 | 7/20/2007 | 600 | $122.22 | $73,332.00 |
| 47 | 7/20/2007 | 100 | $122.21 | $12,221.00 |
| 48 | 7/20/2007 | 200 | $122.18 | $24,436.00 |
| 49 | 7/20/2007 | 200 | $122.17 | $24,434.00 |
| 50 | 7/20/2007 | 225 | $122.16 | $27,486.00 |
| 51 | 7/20/2007 | 150 | $122.15 | $18,322.50 |
| 52 | 7/20/2007 | 300 | $122.14 | $36,642.00 |
| 53 | 7/20/2007 | 100 | $122.07 | $12,207.00 |
| 54 | 7/20/2007 | 100 | $122.06 | $12,206.00 |
| 55 | 7/20/2007 | 50 | $122.05 | $6,102.50 |
| 56 | 7/20/2007 | 100 | $122.04 | $12,204.00 |
| 57 | 7/20/2007 | 200 | $122.03 | $24,406.00 |
| 58 | 7/20/2007 | 300 | $122.02 | $36,606.00 |
| 59 | 7/20/2007 | 2,400 | $122.00 | $292,800.00 |
| 60 | 7/20/2007 | 2,000 | $121.99 | $243,980.00 |
| 61 | 7/20/2007 | 900 | $121.98 | $109,782.00 |
| 62 | 7/20/2007 | 1,200 | $121.97 | $146,364.00 |
| 63 | 7/20/2007 | 600 | $121.96 | $73,176.00 |
| 64 | 7/20/2007 | 1,500 | $121.95 | $182,925.00 |
| 65 | 7/20/2007 | 800 | $121.94 | $97,552.00 |
| 66 | 7/20/2007 | 500 | $121.93 | $60,965.00 |
| 67 | 7/20/2007 | 1,080 | $121.92 | $131,673.60 |

| Reference No. | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| 68 | 7/20/2007 | 500 | $121.91 | $60,955.00 |
| 69 | 7/20/2007 | 200 | $121.90 | $24,380.00 |
| 70 | 7/20/2007 | 200 | $121.89 | $24,378.00 |
| 71 | 7/20/2007 | 600 | $121.87 | $73,122.00 |
| 72 | 7/20/2007 | 400 | $121.85 | $48,740.00 |
| 73 | 7/20/2007 | 300 | $121.84 | $36,552.00 |
| 74 | 7/20/2007 | 200 | $121.83 | $24,366.00 |
| 75 | 2/12/2008 | 7,130 | $56.40 | $402,132.00 |
| 76 | 2/25/2008 | 5,552 | $57.36 | $318,462.72 |
| 77 | 4/28/2008 | 10,667 | $61.34 | $654,313.78 |
| 78 | 4/28/2008 | 100 | $61.34 | $6,134.25 |
| 79 | 4/28/2008 | 1,200 | $61.35 | $73,614.00 |
| 80 | 4/28/2008 | 300 | $61.35 | $18,404.25 |
| 81 | 4/28/2008 | 38,633 | $61.35 | $2,370,134.55 |
| 82 | 4/28/2008 | 5,909 | $61.36 | $362,576.24 |
| 83 | 4/28/2008 | 6,381 | $61.37 | $391,601.97 |
| 84 | 4/28/2008 | 1,502 | $61.38 | $92,192.76 |
| 85 | 4/28/2008 | 100 | $61.39 | $6,138.50 |
| 86 | 4/28/2008 | 2,824 | $61.39 | $173,365.36 |
| 87 | 4/28/2008 | 1,019 | $61.40 | $62,566.60 |
| 88 | 4/28/2008 | 400 | $61.41 | $24,564.00 |
| 89 | 4/28/2008 | 484 | $61.42 | $29,727.28 |
| 90 | 4/28/2008 | 500 | $61.43 | $30,715.00 |
| 91 | 4/28/2008 | 100 | $61.44 | $6,144.00 |
| 92 | 4/28/2008 | 1,600 | $61.45 | $98,320.00 |
| 93 | 4/28/2008 | 400 | $61.46 | $24,584.00 |
| 94 | 4/28/2008 | 200 | $61.49 | $12,298.00 |
| 95 | 4/28/2008 | 200 | $61.54 | $12,308.00 |
| 96 | 4/28/2008 | 4,500 | $61.55 | $276,975.00 |
| 97 | 4/28/2008 | 3,605 | $60.50 | $218,102.50 |
| 98 | 4/28/2008 | 100 | $60.51 | $6,050.50 |
| 99 | 4/28/2008 | 100 | $60.51 | $6,050.70 |
| 100 | 4/28/2008 | 1,695 | $60.51 | $102,564.45 |
| 101 | 4/28/2008 | 300 | $60.52 | $18,156.00 |
| 102 | 4/28/2008 | 200 | $60.53 | $12,105.00 |
| 103 | 4/28/2008 | 100 | $60.53 | $6,052.70 |
| 104 | 4/28/2008 | 1,200 | $60.53 | $72,636.00 |
| 105 | 4/28/2008 | 1,100 | $60.54 | $66,588.50 |
| 106 | 4/28/2008 | 200 | $60.54 | $12,108.00 |
| 107 | 4/28/2008 | 2,500 | $60.55 | $151,375.00 |
| 108 | 4/28/2008 | 501 | $60.56 | $30,340.56 |
| 109 | 4/28/2008 | 400 | $60.57 | $24,228.00 |
| 110 | 4/28/2008 | 200 | $60.58 | $12,116.00 |
| 111 | 4/28/2008 | 1,900 | $60.59 | $115,121.00 |
| 112 | 4/28/2008 | 1,100 | $60.60 | $66,660.00 |
| 113 | 4/28/2008 | 150 | $60.61 | $9,090.75 |

| Reference No. | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| 114 | 4/28/2008 | 1,200 | $60.61 | $72,732.00 |
| 115 | 4/28/2008 | 1,042 | $60.62 | $63,166.04 |
| 116 | 4/28/2008 | 1,172 | $60.63 | $71,058.36 |
| 117 | 4/28/2008 | 3,800 | $60.64 | $230,432.00 |
| 118 | 4/28/2008 | 1,025 | $60.65 | $62,166.25 |
| 119 | 4/28/2008 | 2,855 | $60.66 | $173,184.30 |
| 120 | 4/28/2008 | 100 | $60.67 | $6,066.75 |
| 121 | 4/28/2008 | 400 | $60.68 | $24,272.00 |
| 122 | 4/28/2008 | 700 | $60.69 | $42,483.00 |
| 123 | 4/28/2008 | 1,500 | $60.71 | $91,065.00 |
| 124 | 4/28/2008 | 800 | $60.72 | $48,576.00 |
| 125 | 4/28/2008 | 300 | $60.73 | $18,219.00 |
| 126 | 4/28/2008 | 1,500 | $60.74 | $91,110.00 |
| 127 | 4/28/2008 | 800 | $60.75 | $48,600.00 |
| 128 | 4/28/2008 | 900 | $60.76 | $54,684.00 |
| 129 | 4/28/2008 | 100 | $60.79 | $6,079.00 |
| 130 | 4/28/2008 | 500 | $60.80 | $30,400.00 |
| 131 | 4/28/2008 | 100 | $60.83 | $6,083.00 |
| 132 | 4/28/2008 | 1,600 | $60.84 | $97,344.00 |
| 133 | 4/28/2008 | 1,100 | $60.85 | $66,935.00 |
| 134 | 4/28/2008 | 1,100 | $60.86 | $66,946.00 |
| 135 | 4/28/2008 | 100 | $60.87 | $6,087.00 |
| 136 | 4/28/2008 | 900 | $60.88 | $54,792.00 |
| 137 | 4/28/2008 | 600 | $60.89 | $36,534.00 |
| 138 | 4/28/2008 | 100 | $60.90 | $6,089.50 |
| 139 | 4/28/2008 | 1,901 | $60.90 | $115,770.90 |
| 140 | 4/28/2008 | 1,600 | $60.91 | $97,456.00 |
| 141 | 4/28/2008 | 4,745 | $60.92 | $289,065.40 |
| 142 | 4/28/2008 | 2,002 | $60.93 | $121,981.86 |
| 143 | 4/28/2008 | 100 | $60.94 | $6,093.50 |
| 144 | 4/28/2008 | 1,700 | $60.94 | $103,598.00 |
| 145 | 4/28/2008 | 4,497 | $60.95 | $274,092.15 |
| 146 | 4/28/2008 | 300 | $60.96 | $18,286.50 |
| 147 | 4/28/2008 | 200 | $60.96 | $12,191.50 |
| 148 | 4/28/2008 | 2,600 | $60.96 | $158,496.00 |
| 149 | 4/28/2008 | 2,000 | $60.97 | $121,940.00 |
| 150 | 4/28/2008 | 1,300 | $60.98 | $79,274.00 |
| 151 | 4/28/2008 | 1,780 | $60.99 | $108,562.20 |
| 152 | 4/28/2008 | 100 | $61.00 | $6,099.60 |
| 153 | 4/28/2008 | 8,017 | $61.00 | $489,037.00 |
| 154 | 4/28/2008 | 200 | $61.01 | $12,201.00 |
| 155 | 4/28/2008 | 2,125 | $61.01 | $129,646.25 |
| 156 | 4/28/2008 | 100 | $61.02 | $6,101.50 |
| 157 | 4/28/2008 | 100 | $61.02 | $6,101.75 |
| 158 | 4/28/2008 | 1,049 | $61.02 | $64,009.98 |
| 159 | 4/28/2008 | 1,700 | $61.03 | $103,751.00 |

| Reference No. | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| 160 | 4/28/2008 | 2,100 | $61.04 | $128,184.00 |
| 161 | 4/28/2008 | 9,800 | $61.05 | $598,290.00 |
| 162 | 4/28/2008 | 3,755 | $61.06 | $229,280.30 |
| 163 | 4/28/2008 | 300 | $61.07 | $18,319.50 |
| 164 | 4/28/2008 | 100 | $61.07 | $6,107.00 |
| 165 | 4/28/2008 | 4,444 | $61.07 | $271,395.08 |
| 166 | 4/28/2008 | 5,794 | $61.08 | $353,897.52 |
| 167 | 4/28/2008 | 500 | $61.09 | $30,542.50 |
| 168 | 4/28/2008 | 6,143 | $61.09 | $375,275.87 |
| 169 | 4/28/2008 | 100 | $61.09 | $6,109.12 |
| 170 | 4/28/2008 | 100 | $61.10 | $6,109.50 |
| 171 | 4/28/2008 | 5,093 | $61.10 | $311,182.30 |
| 172 | 4/28/2008 | 300 | $61.10 | $18,330.75 |
| 173 | 4/28/2008 | 100 | $61.10 | $6,110.44 |
| 174 | 4/28/2008 | 100 | $61.11 | $6,110.50 |
| 175 | 4/28/2008 | 6,042 | $61.11 | $369,226.62 |
| 176 | 4/28/2008 | 300 | $61.11 | $18,333.75 |
| 177 | 4/28/2008 | 3,100 | $61.12 | $189,472.00 |
| 178 | 4/28/2008 | 3,200 | $61.13 | $195,616.00 |
| 179 | 4/28/2008 | 100 | $61.14 | $6,113.50 |
| 180 | 4/28/2008 | 2,100 | $61.14 | $128,394.00 |
| 181 | 4/28/2008 | 37,721 | $61.15 | $2,306,639.15 |
| 182 | 4/28/2008 | 400 | $61.16 | $24,462.00 |
| 183 | 4/28/2008 | 11,600 | $61.16 | $709,456.00 |
| 184 | 4/28/2008 | 100 | $61.17 | $6,116.50 |
| 185 | 4/28/2008 | 100 | $61.17 | $6,116.75 |
| 186 | 4/28/2008 | 14,129 | $61.17 | $864,270.93 |
| 187 | 4/28/2008 | 300 | $61.18 | $18,352.50 |
| 188 | 4/28/2008 | 100 | $61.18 | $6,117.75 |
| 189 | 4/28/2008 | 4,500 | $61.18 | $275,310.00 |
| 190 | 4/28/2008 | 500 | $61.18 | $30,591.25 |
| 191 | 4/28/2008 | 3,889 | $61.19 | $237,967.91 |
| 192 | 4/28/2008 | 200 | $61.19 | $12,238.50 |
| 193 | 4/28/2008 | 24,362 | $61.20 | $1,490,954.40 |
| 194 | 4/28/2008 | 1,000 | $61.21 | $61,205.00 |
| 195 | 4/28/2008 | 500 | $61.21 | $30,603.75 |
| 196 | 4/28/2008 | 10,662 | $61.21 | $652,621.02 |
| 197 | 4/28/2008 | 200 | $61.21 | $12,242.50 |
| 198 | 4/28/2008 | 300 | $61.22 | $18,364.50 |
| 199 | 4/28/2008 | 8,121 | $61.22 | $497,167.62 |
| 200 | 4/28/2008 | 500 | $61.22 | $30,610.00 |
| 201 | 4/28/2008 | 200 | $61.23 | $12,245.00 |
| 202 | 4/28/2008 | 20,187 | $61.23 | $1,236,050.01 |
| 203 | 4/28/2008 | 7,400 | $61.24 | $453,139.00 |
| 204 | 4/28/2008 | 300 | $61.24 | $18,371.25 |
| 205 | 4/28/2008 | 25,079 | $61.24 | $1,535,837.96 |

| Reference No. | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| 206 | 4/28/2008 | 100 | $61.24 | $6,124.25 |
| 207 | 4/28/2008 | 600 | $61.25 | $36,747.00 |
| 208 | 4/28/2008 | 100 | $61.25 | $6,124.75 |
| 209 | 4/28/2008 | 200 | $61.25 | $12,249.60 |
| 210 | 4/28/2008 | 100,359 | $61.25 | $6,146,988.75 |
| 211 | 4/28/2008 | 600 | $61.25 | $36,751.50 |
| 212 | 4/28/2008 | 800 | $61.26 | $49,004.00 |
| 213 | 4/28/2008 | 200 | $61.26 | $12,251.50 |
| 214 | 4/28/2008 | 12,819 | $61.26 | $785,291.94 |
| 215 | 4/28/2008 | 200 | $61.26 | $12,252.50 |
| 216 | 4/28/2008 | 900 | $61.27 | $55,138.50 |
| 217 | 4/28/2008 | 400 | $61.27 | $24,507.00 |
| 218 | 4/28/2008 | 8,845 | $61.27 | $541,933.15 |
| 219 | 4/28/2008 | 300 | $61.28 | $18,382.50 |
| 220 | 4/28/2008 | 100 | $61.28 | $6,127.75 |
| 221 | 4/28/2008 | 9,484 | $61.28 | $581,179.52 |
| 222 | 4/28/2008 | 600 | $61.28 | $36,769.50 |
| 223 | 4/28/2008 | 1,100 | $61.29 | $67,413.50 |
| 224 | 4/28/2008 | 100 | $61.29 | $6,128.80 |
| 225 | 4/28/2008 | 100 | $61.29 | $6,129.00 |
| 226 | 4/28/2008 | 13,166 | $61.29 | $806,944.14 |
| 227 | 4/28/2008 | 100 | $61.29 | $6,129.25 |
| 228 | 4/28/2008 | 2,300 | $61.30 | $140,978.50 |
| 229 | 4/28/2008 | 23,858 | $61.30 | $1,462,495.40 |
| 230 | 4/28/2008 | 600 | $61.30 | $36,781.50 |
| 231 | 4/28/2008 | 500 | $61.31 | $30,652.50 |
| 232 | 4/28/2008 | 5,208 | $61.31 | $319,302.48 |
| 233 | 4/28/2008 | 700 | $61.31 | $42,918.75 |
| 234 | 4/28/2008 | 700 | $61.32 | $42,920.50 |
| 235 | 4/28/2008 | 6,000 | $61.32 | $367,920.00 |
| 236 | 4/28/2008 | 700 | $61.32 | $42,925.75 |
| 237 | 4/28/2008 | 2,200 | $61.33 | $134,915.00 |
| 238 | 4/28/2008 | 320 | $61.33 | $19,624.80 |
| 239 | 4/28/2008 | 11,700 | $61.33 | $717,561.00 |
| 240 | 4/28/2008 | 2,900 | $61.33 | $177,864.25 |
| 241 | 4/28/2008 | 2,400 | $61.34 | $147,204.00 |
| 242 | 4/28/2008 | 82 | $61.34 | $5,029.68 |
| 243 | 5/5/2008 | 1,613 | $61.98 | $99,973.74 |
| 244 | 5/5/2008 | 1,612 | $61.98 | $99,911.76 |
| 245 | 5/19/2008 | 75,300 | $63.53 | $4,783,809.00 |
| **Total** | | **726,249** | | **$47,185,741.96** |

104.   Defendant Campbell's sales are suspicious as represented by the following charts, which compare his challenged stock trades during the Suspicious Sales Period (July 19, 2007 to

November 5, 2008) to his trades during March 31, 2006 to July 18, 2007 (the "Pre-Suspicious Sales Period"). Defendant Campbell sold 53.48% of his Textron holdings during the Suspicious Sales Period. He also sold 58% more shares during the Suspicious Sales Period compared to the Pre-Suspicious Sales Period.

| Shares Sold During Suspicious Sales Period | 726,249 |
|---|---|
| Shares Remaining After Sales | 277,422 |
| Indirect Shares Remaining After Sales | 20,225 |
| In-the-Money Options Remaining After Sales | 334,197 |
| Total Trading Potential Before Sales | 1,358,093 |
| **Total Proceeds from Sales** | **$47,185,741.96** |
| **% of Total Ownership Sold During Suspicious Sales Period** | **53.48%** |

| Shares Sold During Pre-Suspicious Sales Period | 590,367 |
|---|---|
| Shares Remaining After Sales | 169,063 |
| Indirect Shares Remaining After Sales | 9,421 |
| Total Trading Potential Before Sales | 768,851 |
| **Total Proceeds from Sales** | **$27,493,284.49** |

## XII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

105. Plaintiff brings this action derivatively in the right and for the benefit of Textron to redress injuries suffered, and to be suffered, by Textron as a direct result of breaches of fiduciary duty, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Textron is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

106. Plaintiff will adequately and fairly represent the interests of Textron in enforcing and prosecuting its rights.

107. Plaintiff was a shareholder of Textron at the time of the continuing wrong complained of. The continuing wrong included the issuance of false and misleading statements regarding Textron's backlog and business prospects to artificially inflate Textron's stock price during July 2007 to November 2008. Plaintiff was also a shareholder of Textron at the time of certain of the improper repurchases of Textron's shares to further inflate Textron's stock price during the third fiscal quarter 2008. Once the plaintiff became a shareholder, he has continuously been a shareholder.

108.     The current Board of Textron consists of the following thirteen individuals (eleven are named defendants and two are not defendants): defendants Campbell, Bader, Clark, Gagne, Hancock, Ziemer Evans, Fish, Ford, Powell, Wheeler, and directors Lloyd G. Trotter and Scott C. Donnelly.

### A.     Demand Futility as to Defendant Campbell

109.     As alleged above, defendant Campbell breached his fiduciary duties of loyalty and good faith by making false and misleading statements regarding Textron's business prospects and backlog. Also, during the Suspicious Sales Period, defendant Campbell sold Textron stock under suspicious circumstances as alleged above. Defendant Campbell's sales are suspicious because he sold 58% more shares during the Suspicious Sales Period compared to the Pre-Suspicious Sales Period. As a result, Campbell faces a sufficiently substantial likelihood of liability for his breach of fiduciary duty. Accordingly, demand is futile as to defendant Campbell.

110.     The principal professional occupation of defendant Campbell is his employment with Textron, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, Textron paid defendant Campbell the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $1,100,000 | $6,286,534 | $2,223,573 | $617,980 | $473,434 | $650,842 |
| 2007 | $1,100,000 | $8,436,661 | $2,229,762 | $2,200,000 | $9,839,709 | $588,996 |
| 2006 | $1,100,000 | $9,214,495 | $537,443 | $2,072,653 | $10,156,005 | $590,437 |

Accordingly, defendant Campbell is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation

and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Campbell.

111.    If defendant Campbell were to bring this action against himself, he would thereby expose his own misconduct, which underlies allegations against him contained in class action complaints for violations of securities law, which admissions would impair his defense of the class actions and greatly increase the probability of his personal liability in the class actions. In essence, he would be forced to take positions contrary to the defenses he will likely assert in the securities class actions. This he will not do. Thus, demand is futile.

**B.      Demand Futility as to the Audit Committee**

112.    Defendants Bader, Clark, Gagne, Hancock, and Ziemer, as members of the Audit Committee, were responsible under the Audit Committee charter in effect during 2007 and 2008 for reviewing and approving the false and misleading earnings press releases and statements made to investors and analysts during conference calls. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved false statements that misled Textron's shareholders into believing that Textron's business prospects were supported by a record backlog and that the risk of cancellations and deferrals eroding that backlog was not noteworthy. Accordingly, these defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon these defendants is futile.

**C.      Demand Futility as to All Director Defendants**

113.    Defendants Campbell, Bader, Clark, Evans, Fish, Ford, Gagne, Hancock, Powell, Wheeler, and Ziemer as members of the Board during 2007 and 2008, authorized and failed to halt the repurchases of over $608 million worth of the Company's shares at artificially inflated prices.

Textron repurchased these shares under a stock repurchase program that the Board authorized during July 2007. All of these defendants participated in the July 2007 authorization. The Board's decisions to authorize the stock repurchase was not the product of valid business judgment. The Board knowingly or recklessly authorized the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's backlog and business prospects. Further, defendant Campbell engaged in self-dealing in that he sold his personally held shares while directing the Company to buy shares. Accordingly, demand is futile.

114.   Moreover, the acts complained of constitute violations of the fiduciary duties owed by Textron's officers and directors and these acts are incapable of ratification.

115.   Each of the defendant directors of Textron authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

116.   Any suit by the current directors of Textron to remedy these wrongs would likely expose the Individual Defendants and Textron to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

117.   Textron has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed

any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Textron any part of the damages Textron suffered and will suffer thereby.

118.   If Textron's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Textron. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Textron against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause Textron to sue themselves or certain of the officers of Textron, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance, then the current directors will not cause Textron to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the company from the insurance.

119.   Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Textron for any of the wrongdoing alleged by plaintiff herein.

120.   Plaintiff has not made any demand on shareholders of Textron to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   Textron is a publicly held company with over 270 million shares outstanding, and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no reasonable way of finding out the names, addresses, or phone numbers of the thousands of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**Derivatively Against Defendants Campbell and French for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

121.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.   The wrongful conduct alleged regarding the issuance of false and misleading statements, during July 2007 through November 2008, was continuous, connected, and was on-going throughout the applicable time period.   It resulted in continuous, connected, and on-going harm to the Company.

123.   As alleged above, during 2007 and 2008, defendants Campbell and French knowingly or recklessly made and caused the publication of false and misleading statements regarding Textron's future business prospects and present financial condition, and knowingly, willfully and acting with scienter caused Textron to repurchase 12,986,910 shares of its own stock on the open market at a weighted average price per share of $46.84, for a total cost to Textron of $608 million, when they knew that Textron's stock price was artificially inflated due to their misleading statements.   Of that amount, during the third fiscal quarter 2008, Textron repurchased 8,113,910 shares of its own stock

at an average sale price of $42.18 per share for a total cost of $342.2 million. The repurchases of Textron stock were intended to and did manipulate and/or deceive Textron and its shareholders.

124.     Defendants Campbell and French thereby violated §10(b) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 in that they:

   (a) employed devices, schemes and artifices to defraud Textron;

   (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Textron in connection with the purchases of Textron common stock.

125.     As a direct and proximate result of the wrongful conduct of Campbell and French, Textron has and will suffer damages in connection with its purchases of Textron common stock at prices that Campbell and French knew to be artificially inflated.

126.     But for the misconduct of Campbell and French, Textron would not have repurchased its stock at artificially inflated prices. Textron reasonably relied on the diligence, loyalty, and good faith of defendants Campbell and French in repurchasing its stock.

127.     Campbell and French's conduct proximately caused Textron's loss. Textron's stock price fell in a series of drops following the publication of disclosures that revealed the truth about Textron's earnings prospects and backlog and exposure to the risk that its backlog would erode as economic conditions worsened. After Textron's true prospects and financial condition were fully revealed, Textron's shares ultimately fell to $9.03 per share on January 30, 2009 from $18.64 per share on November 4, 2008.

128.    Defendants Campbell and French are therefore liable to Textron for damages in an amount to be determined at trial pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Derivatively Against Defendants Bader, Clark, Gagne, Hancock, Ziemer, and Campbell for Violation of §20(a) of the Exchange Act

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    The wrongful conduct alleged regarding the issuance of false and misleading statements, during July 2007 through November 2008, was continuous, connected, and was on-going throughout the applicable time period.  It likewise resulted in continuous, connected, and on-going harm to the Company.

131.    The Audit Committee Defendants Bader, Clark, Gagne, Hancock, and Ziemer, as directors and as members of the Audit Committee, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of earnings press releases and information disclosed during earnings conference calls that was disseminated by Textron, and had the power and/or ability directly or indirectly to control or influence defendant Campbell, as Textron's CEO, and defendant French, as Textron's former CFO, in connection with the specific corporate policies and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

132.    Defendant Campbell, as Textron's CEO and as a director, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the

content of public statements and financial statements disseminated by Textron and the timing and amount of stock repurchases, and had the power and/or ability to, and did, directly or indirectly control or influence defendant French in connection with the specific corporate policies and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

133.    Defendants Bader, Clark, Gagne, Hancock, Ziemer, and Campbell did not act in good faith in regard to these allegations.   They are jointly and severally liable under §20(a) of the Exchange Act to the same extent as defendants Campbell and French for the primary violations of §10(b) and Rule 10b-5 promulgated thereunder, as set forth herein.

## COUNT III

### Against Defendants Campbell and French for Breach of Fiduciary Duties of Due Care, Loyalty and Good Faith for Dissemination of False and Misleading Statements

134.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.    The wrongful conduct alleged regarding the issuance of false and misleading statements, during July 2007 through November 2008, was continuous, connected, and was on-going throughout the applicable time period.   It resulted in continuous, connected, and on-going harm to the Company.

136.    Defendants Campbell and French owed and owe Textron fiduciary obligations.   By reason of their fiduciary relationships, Campbell and French owed and owe Textron the highest obligation of good faith, fair dealing, loyalty and due care.

137.    Defendants Campbell and French violated and breached their fiduciary duties of care, loyalty, and good faith by knowingly or recklessly making false statements regarding Textron's

backlog and business prospects.  As alleged above, these statements falsely suggested that based upon Textron's "record" backlog, Textron would be largely insulated from the economic downturn. These statements were false and misleading, however, because, as defendants Campbell and French knew, Textron faced a substantial risk its backlog would erode as economic conditions worsened and Textron was not insulated.  Campbell and French's false statements were included in earnings press releases and in conference calls hosted for investors and analysts.

138.    These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.    As a direct and proximate result Campbell and French's failure to perform their fiduciary obligations, Textron has sustained significant damages.  As a result of the misconduct alleged herein, Campbell and French are liable to the Company.

## COUNT IV

### Against the Audit Committee Defendants for Breach of the Fiduciary Duties of Loyalty and Good Faith

140.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.    The wrongful conduct alleged regarding the issuance of false and misleading statements, during July 2007 through November 2008, was continuous, connected, and was on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

142.    The Audit Committee Defendants, defendants Bader, Clark, Gagne, Hancock and Ziemer, owed and owe Textron fiduciary obligations.  Additionally, the Audit Committee

Defendants owed specific duties under the Audit Committee charter in effect during fiscal 2007 through 2008 to Textron to review and discuss Textron's quarterly and annual financial results, earnings press releases, and prepared statements and the content of information discussed during earnings conference calls. By reason of their fiduciary relationships, these defendants owed and owe Textron the highest obligation of loyalty, fair dealing and good faith.

143.   The Audit Committee Defendants violated and breached their fiduciary duties of loyalty, reasonable inquiry, oversight, good faith, and supervision by knowingly or recklessly reviewing and approving false statements included in Textron's earnings press releases and made during conference calls to analysts and investors. As alleged above, these statements suggested that, based upon Textron's "record" backlog, the Company would be largely insulated from the economic downturn. In truth, however, as the Audit Committee Defendants knew, Textron faced a substantial risk that its backlog would erode as economic conditions worsened and Textron was not insulated.

144.   The Audit Committee Defendants' wrongful conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.   As a direct and proximate result of the Audit Committee Defendants' failure to perform their fiduciary obligations, Textron has sustained significant damages. As a result of the misconduct alleged herein, the Audit Committee Defendants are liable to the Company.

## COUNT V

### Against Defendants Campbell, Bader, Clark, Evans, Fish, Ford, Gagne, Hancock, Powell, Wheeler, and Ziemer for Breach of the Fiduciary Duties of Loyalty and Good Faith

146.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The wrongful conduct alleged regarding the issuance of false and misleading statements, during July 2007 through November 2008, was continuous, connected, and was on-going throughout the applicable time period. It resulted in continuous, connected, and on-going harm to the Company.

148.    Defendants Campbell, Bader, Clark, Evans, Fish, Ford, Gagne, Hancock, Powell, Wheeler, and Ziemer owed and owe Textron fiduciary obligations. By reason of their fiduciary relationships, these defendants owed and owe Textron the highest obligation of loyalty, fair dealing and good faith.

149.    Defendants Campbell, Bader, Clark, Evans, Fish, Ford, Gagne, Hancock, Powell, Wheeler, and Ziemer violated and breached their fiduciary duties of loyalty, reasonable inquiry, oversight, good faith and supervision by knowingly or recklessly authorizing and failing to halt the repurchase of shares while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's backlog and business prospects. While Textron's stock was artificially inflated, Textron repurchased 12,986,910 shares of its own stock at an average price of $46.84, for a total cost of $608 million. Of that amount, during the third fiscal quarter 2008, Textron repurchased 8,113,910 shares of its own stock at an average sale price of $42.18 per share for a total cost of $342.2 million.

150.    Defendants Campbell, Bader, Clark, Evans, Fish, Ford, Gagne, Hancock, Powell, Wheeler, and Ziemer's wrongful conduct could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

151.    As a direct and proximate result of defendants Campbell, Bader, Clark, Evans, Fish, Ford, Gagne, Hancock, Powell, Wheeler, and Ziemer's failure to perform their fiduciary obligations,

Textron has sustained significant damages.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

### COUNT VI

### Against All Defendants for Waste of Corporate Assets

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    The wrongful conduct alleged regarding the issuance of false and misleading statements, during July 2007 through November 2008, was continuous, connected, and was on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

154.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) directing Textron to repurchase over $608 million of its own stock at artificially inflated prices, including $342 million shares repurchased during the third fiscal quarter 2008; (ii) failing to properly consider the interests of the Company and its public shareholders; (iii) failing to conduct proper supervision; (iv) by paying bonuses to certain of its executive officers; and (v) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

155.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf of Textron, has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Unjust Enrichment

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158.    The wrongful conduct alleged regarding the issuance of false and misleading statements, during July 2007 through November 2008, was continuous, connected, and was on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

159.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Textron. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Textron.

160.    Plaintiff, as a shareholder and representative of Textron, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

161.    Plaintiff, on behalf of Textron, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands for a judgment as follows:

A.    Declaring that defendants Campbell and French are liable under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and that the Director Defendants are jointly and severally liable under §20(a) of the Exchange Act, and awarding Textron damages on these counts;

     B.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

     C.     Directing Textron to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Textron and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

     1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

     2.     a provision to permit the shareholders of Textron to nominate at least three candidates for election to the Board;

     3.     a proposal to ensure the adequate monitoring of disclosures regarding the size and quality of Textron's backlog; and

     4.     a proposal to control insider selling.

     D.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Textron has an effective remedy;

     E.     Awarding to Textron restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.    Awarding to plaintiff reasonable attorneys' fees, consultant and expert fees, costs and

expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## XIII.   JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 18, 2009

John D. Walker
By his attorneys,
MOORE, VIRGADAMO & LYNCH, LTD.

JEREMIAH C. LYNCH, III  #3968
97 John Clarke Road
Middletown, RI  02842
Telephone: (401) 846-0120
Facsimile:  (401) 848-0234
jlynch@mvllaw.com

ROBBINS UMEDA LLP
MARC M. UMEDA
KEVIN A. SEELY
GREGORY E. DEL GAIZO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

Attorneys for Plaintiff

428212_

VERIFICATION

I, John D. Walker, hereby declare as follows:

I am a shareholder of Textron, Inc.  I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of the Company.  I have reviewed the Verified Shareholder Derivative Complaint for Violations of the Securities Exchange Act of 1934, Breach of Fiduciary Duty, Waste of Corporate Assets and Unjust Enrichment (the "Complaint").  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:


Dated:   11· 13  2009


_____
JOHN D. WALKER