UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

In Re Textron, Inc.,
Shareholder Derivative Litigation

Case No. 09-cv-556-PB

### MEMORANDUM AND ORDER

John D. Walker filed this shareholder derivative action on
behalf of Textron, Inc. against two of the company's officers
and 11 of its 13 directors.  The defendants have responded with
a motion arguing that the complaint must be dismissed because
Walker filed the action without first demanding that the company
bring the suit itself.  The issue that the case presents is
whether Walker has sufficiently alleged that a pre-suit demand
would have been futile.

## I.   BACKGROUND

Textron is a conglomerate that manufactures and sells
helicopters, airplanes, light transportation vehicles, and lawn
care machinery.  It is also a major supplier to the automotive
industry, and it has a large commercial finance business.
Walker bases his claims on a stock purchase plan that the
company's board of directors approved on July 19, 2007, and a

series of allegedly misleading statements that Textron's CEO,
Lewis B. Campbell, and CFO, Ted J. French, made concerning the
company's "backlog" of aircraft and helicopter orders.

## A.   The Stock Repurchase Plan

On July 19, 2007, Textron's board approved a stock
repurchase plan that authorized the company to repurchase up to
24 million shares of its own stock.  Complaint ("Compl.") ¶ 57,
Doc. No. 1.  At the time, the country was facing a substantial
risk of a recession.  Id. ¶ 55.  As early as March 6, 2007,
former Federal Reserve Chairman Alan Greenspan estimated that
there was a "one-third probability" of a U.S. recession.  Id.
Shortly thereafter, the *Los Angeles Times* published a poll in
which sixty percent of the respondents stated that they believed
a recession was likely during 2007.  Id.  Despite these warning
signs, from July 19, 2007 through September 27, 2008, Textron's
officers, acting pursuant to the stock repurchase plan,
purchased approximately $608 million worth of Textron stock at
an average share price of $46.84.  Id. ¶¶ 57, 113.

During the repurchase period, Campbell sold 726,249 shares
of his own stock for $47,185,741.96.  Id. ¶ 103.  This amounted
to 53.48% of his Textron holdings, and 58% more shares than he
had sold during the previous sixteen month period.  Id. ¶ 104.

**B.    The Backlog Statements**

Textron's Cessna and Bell segments manufacture aircraft and helicopters.  Cessna produces approximately 40% of Textron's revenues and Bell produces approximately 20%.  Id. ¶ 50.  When a customer orders an airplane or a helicopter from Textron, the company requires the customer to put down a non-refundable deposit, and the order is added to the company's reported backlog.

Campbell and French made numerous allegedly misleading public statements concerning the backlog between July 2007 and October 2008 that artificially inflated the value of Textron's stock.  Walker claims that the allegedly misleading statements were also tacitly approved by the board's audit committee, which had been charged with "discuss[ing] earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies with management and the independent auditor, as appropriate."  Id. ¶ 35.

The statements at issue highlighted the size and growth rate of the reported backlog, which grew from a combined $14 million in July 2007 to $23.5 million in October 2008.  Id. ¶¶ 60-91.  In treating the backlog as a reliable indicator of the company's prospects for future growth, Campbell and French

[3]

emphasized the quality of the underwriting that was performed with each customer's order and the low number of cancellations that the company was then experiencing.  Id. ¶¶ 84-85, 89.

On July 19, 2007, Textron issued a press release announcing the board's authorization of the stock repurchase plan.  Id. ¶ 60.  In the press release, Campbell commented on the board's decision noting that "[t]hese actions by our Board demonstrate confidence in our ability to execute and underscore the company's commitment to value creation through a balanced strategy of growth and returning cash to the shareholder."  Id. The release also announced that Textron had raised its earnings guidance "[g]iven the strength of demand for our innovative products" as evidenced by the $14 billion Cessna and Bell backlog.  Id. ¶¶ 61-62.

As the general economy began to weaken, Campbell and French continued to assure investors that the company's reviews of prior economic downturns left it with confidence that the backlog was large enough to support their growth projections. Id. ¶ 67-74.  On January 24, 2008, Textron issued an earnings press release announcing its financial results for the preceding quarter.  Id. ¶ 67.  The release reported a $4.1 billion increase in Cessna's backlog from fiscal year 2006.  Id.  During

[4]

an investor conference call that same day, Campbell once again
touted the backlog's growth, remarking that Textron's "ending
aircraft backlog of 16.4 billion, [was] up 41% from a year ago."
Id. ¶ 69.  Campbell also commented on the resiliency of the
backlog, noting that contracts for Cessna orders would include
"nonrefundable initial deposits of $1 million."  Id. ¶ 70.
Campbell assured investors that "[w]hile we expect a softening
and maybe even a temporary downturn in the U.S. economy in 2008,
we believe we are particularly well positioned given our strong
aircraft and military backlogs."  Id. ¶ 67.  French also assured
investors that while "the U.S. economy is now weaker and it's
certainly more uncertain . . . we have good revenue visibility
based on our solid growing backlogs . . . ."  Id. ¶ 72.

     Throughout the spring and summer of 2008, Campbell and
French continued to tout the size and strength of the backlog,
notwithstanding the onset of a recession.  Id. ¶¶ 76-86.
Campbell reported that "strong performance in our aircraft and
defense businesses, [and] the size and resiliency of our backlog
. . . give us the confidence to maintain our overall outlook for
the rest of the year and beyond."  Id. ¶ 82.  Campbell also
claimed that he "[did] not view cancellations as a significant
risk to [Textron's] outlook."  Id. ¶ 84.

During the fall of 2008, Campbell and French continued to assure investors that the company was on a firm financial footing based on the purported backlog. Id. ¶¶ 87-92. On October 16, 2008, Campbell noted that he "remain[ed] comfortable with next year's production plan at [that] point" because "[w]e are fortunate at this time to have . . . a very large and robust backlog" and the reported cancellations to that point were "not even noteworthy." Id. ¶¶ 88-89. Campbell also remarked that his confidence in the backlog was buttressed by the fact that Textron required buyers to provide a nonrefundable deposit and "an understanding of where [the buyer is] going to get [its] financing." Id. ¶ 90.

Despite these assurances, on November 5, 2008, Campbell admitted at an industrial conference that buyers were delaying purchases because of "trouble getting financing." Id. ¶ 93. On January 29, 2009, Textron reported a decrease in the combined backlog of approximately $300 million, from $23.5 billion to $23.2 billion. Id. ¶ 95. In an earnings call that same day, Campbell attributed the decrease in the backlog to 23 cancellations and an "unprecedented number of deferrals." Id. Textron's backlog continued to shrink as a result of cancellations and deferrals from $23.2 billion in the fourth

[6]

quarter of 2008 to $16.1 billion in the second quarter of 2009. Id. ¶ 97.

Although Textron's securities filings recognized that "[d]elays in aircraft delivery schedules or cancellations of orders may adversely affect our financial results" and "[a]ircraft customers . . . may respond to weak economic conditions by delaying delivery of orders or canceling of orders," id. ¶ 52, Walker alleges that the statements Campbell and French made about the backlog between July 2007 and October 2008 were misleading because they failed to disclose the substantial risk of cancellations and deferrals. Id. ¶¶ 2, 66, 75, 79, 86, 92. He also argues that the company was injured by the stock purchases it made pursuant to the repurchase plan because the company acquired the stock at inflated prices and in an environment in which the company was facing excessive economic risk. Id. ¶ 59.

C.   **Walker's Claims**

Walker presents seven claims for relief. Counts I-IV are based on the allegedly misleading statements that Campbell and French made concerning the backlog. These counts charge that Campbell, French, and the five directors who were also members of the audit committee (the "Audit Committee Defendants")

[7]

violated Sections 10(b) and 20(a) of the Securities and Exchange
Act of 1934 ("Exchange Act"), and breached fiduciary duties they
owed to Textron under Delaware law.  Count V charges Campbell
and 10 of the company's 12 other directors (collectively the
"Director Defendants") with breach of fiduciary duty for
authorizing the stock repurchase plan and failing to prevent
stock purchases from being made pursuant to the plan.  Count VI
charges French and the Director Defendants with corporate waste,
and Count VII seeks to recover against the same defendants for
unjust enrichment.

## I.    STANDARD OF REVIEW

Shareholder derivative actions filed in federal court are
governed by Rule 23.1 of the Federal Rules of Civil Procedure.
See Fed. R. Civ. P. 23.1(b)(3)(B).  If the applicable state law
calls for a pre-suit demand, Rule 23.1 requires that a
plaintiff's reasons for not making a demand must be pleaded with
particularity.  Id.; see, e.g., In re Sonus Networks, Inc.
S'holder Derivative Litig., 499 F.3d 47, 66 (1st Cir. 2007).
Mere conclusions or generally pleaded allegations of the type
that ordinarily will be sufficient under Fed. R. Civ. P. 8(a)
will not satisfy the particularity requirement.  See Stepak v.

Addison, 20 F.3d 398, 402 (11th Cir. 1994); Gonzalez Turul v.
Rogatol Distribs., Inc., 951 F.2d 1, 3 (1st Cir. 1991); Gaubert
v. Fed. Home Loan Bank Bd., 863 F.2d 59, 68 (D.C. Cir. 1988).

In ruling on a motion to dismiss for failure to plead
demand futility, I apply the familiar standard that governs
motions to dismiss for failure to state a claim under Fed. R.
Civ. P. 12(b)(6). Thus, I construe the complaint in the light
most favorable to Walker when evaluating his contention that a
pre-suit demand would have been futile. See, e.g., IOM Corp. v.
Brown Forman Corp., 627 F.3d 440, 443 (1st Cir. 2010) (applying
Rule 12(b)(6) standard). But cf. In re Sonus Networks, 499 F.3d
at 61-62 (noting that dismissal under Rule 23 "is not entirely
analogous to dismissal for failure to state a claim").

### III.  DISCUSSION

The question presented by defendants' motion to dismiss is
whether Walker has pleaded demand futility with the
particularity required by Rule 23.1. The parties agree that the
substantive legal standards that define the demand requirement
and identify the circumstances under which a demand will be
excused are supplied by Delaware law because Textron is a
Delaware corporation. See, e.g., Kamen v. Kemper Fin. Servs.,

500 U.S. 90, 97-98 (1991) (holding that the state of
incorporation supplies the substantive law that governs a demand
futility claim).  Accordingly, I review the relevant Delaware
law before examining the parties' specific arguments.

A.    **Delaware Law**

Delaware's General Corporation Law recognizes that
directors, not stockholders, manage the business and affairs of
the corporation.  See Del. Code Ann. tit. 8, § 141(a) (West
2011); Alabama By-Prods. Corp. v. Cede & Co., 657 A.2d 254, 265
(Del. 1995).  The power to manage ordinarily encompasses the
power to decide whether to sue on the corporation's behalf.
Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984) (*overruled in
part on other grounds*); In re Citigroup Inc. S'holder Derivative
Litig., 964 A.2d 106, 120 (Del. Ch. 2009).  Thus, a shareholder
derivative action is an exception to the general rule that
directors control a decision to sue, and Delaware law ordinarily
permits such actions only when either the company's board of
directors has wrongfully refused a shareholder demand to sue, or
a pre-suit demand would have been futile.  Grimes v. Donald, 673
A.2d 1207, 1216 (Del. 1996).

The Delaware Supreme Court has adopted two tests of demand
futility.  Challenges to a board decision or a conscious failure

to act are subject to the two-part "Aronson test."  Under this test, demand futility can be established through either facts that give rise to a reasonable doubt as to whether the board was "disinterested and independent" or facts that raise a reasonable doubt as to whether the challenged conduct was "the product of a valid business judgment." Aronson, 473 A.2d at 814.  Demand futility claims that do not turn on an exercise of the board's business judgment, in contrast, are judged only by asking whether a reasonable doubt exists as to whether the board "could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993).  The cases refer to this test as the "Rales test," although it merely restates the first prong of Aronson.  In re Autodesk, Inc. S'holder Derivative Litig., No. C 06-7185 PJH, 2008 WL 5234264, at *5 (N.D. Cal. Dec. 15, 2008) (noting that the Rales test and the first prong of the Aronson test are the same).

    Certain legal principles apply under both Aronson and Rales.  First, "futility is gauged by the circumstances existing at the commencement of a derivative suit."  In re Am. Int'l Group, Inc. Derivative Litig., 700 F.Supp.2d 419, 430 (S.D.N.Y. 2010) (quoting Aronson, 473 A.2d at 810).  Second, demand

[11]

futility must be demonstrated on a claim-by-claim basis.  <u>Beam</u>

<u>ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart</u>, 833

A.2d 961, 977 n.48 (Del. Ch. 2003); <u>see</u> <u>Grossman v. Johnson</u>, 674

F.2d 115, 123-125 (1st Cir. 1982).  Third, "a disqualifying

interest or lack of independence must afflict a majority of the

corporation's directors in order for demand to be excused" on

this basis.  3 Stephen A. Radin, <u>The Business Judgment Rule</u> 4025

(6th ed. 2009) (citing <u>Beam ex rel. Martha Stewart Living</u>

<u>Omnimedia, Inc. v. Stewart</u>, 845 A.2d 1040, 1049 (Del. 2004)).

Finally, although the prospect of personal liability may prevent

a director from being able to impartially evaluate a demand,

futility cannot be established merely by alleging that the

directors would be asked to sue themselves.  Instead, "demand

will be excused based on a possibility of personal director

liability only in the rare case when a plaintiff is able to show

director conduct that is so egregious on its face that board

approval cannot meet the test of business judgment, and a

substantial likelihood of director liability therefore exists."

<u>In re Citigroup</u>, 964 A.2d at 121 (internal quotations omitted).

[12]

B.   **Application**

Walker's claims can be divided into two groups for purposes of analysis.   Counts I-IV are based on defendants' alleged misstatements about the backlog.   Because these claims do not turn on either a board decision or a conscious failure of the board to act, demand futility with respect to these counts is judged under Rales.[1]   Counts V-VII are based in part on the board's decision to approve the stock purchase plan and in part on its failure to halt purchases made pursuant to the plan after the company's stock price had been artificially inflated by the defendants' allegedly misleading statements about the backlog. These claims are subject to Aronson to the extent that they challenge the initial board decision to approve the stock repurchase plan, but they are otherwise governed by Rales

---

[1]   Although Walker seeks to hold the individual members of the audit committee liable for tacitly authorizing the allegedly misleading statements, he does not claim that the full board ever made a formal decision to approve the statements.   Further, although he asserted in his brief that each of the Director Defendants "made a conscious decision to refrain from correcting or preventing the issuance of [the allegedly misleading statements]," Pl's. Memo. of Law in Opp. to Def.'s M. to Dismiss the Compl. at 33, he conceded at oral argument that his complaint lacks any particularized allegations to support this assertion with respect to the majority of the board members who neither made or tacitly authorized the statements.   Mot. Hr'g Tr. 72-73, Mar. 11, 2011 (Doc. No. 46).   As a result, demand futility with respect to these claims is properly analyzed under Rales, 634 A.2d at 934, n.9.

because the board members' alleged failure to halt stock purchases after Campbell and French made their allegedly misleading statements does not turn on either an affirmative board decision or a conscious failure of the board to act.[2]  I begin with Counts I-IV.

## 1.  <u>Counts I-IV</u>

Walker bases his demand futility argument with respect to Counts I-IV solely on his claim that the directors were not disinterested because they face a substantial likelihood of personal liability on the counts even though a majority of the directors are not named in the counts as defendants.[3]  Rule 23.1

---

[2] Walker contends that the board's failure to halt the stock repurchase plan should be analyzed under <u>Aronson</u>.  <u>See</u> Mot. Hr'g Tr. 53-60, Mar. 11, 2011 (Doc. No. 46).  However, Walker's complaint does not contain any particularized facts indicating either that board approval was required for each individual repurchase or that a majority of the directors consciously failed to act to stop stock purchases under the plan.  The defendants, on the other hand, represented that the July 18, 2007 minutes of a special board meeting demonstrate that the board gave management discretion to make stock purchases under the plan without further board approvals.  Mot. Hr'g Tr. 62, Mar. 11, 2011 (Doc. No. 46).  As a result, to the extent that Counts V-VII premise liability on the board's failure to halt the repurchase plan, my demand futility analysis will be guided by <u>Rales</u>.

[3] Walker also claimed for the first time during oral argument that the directors who were not sued in Counts I-IV were interested with respect to these counts because they face a substantial likelihood of liability with respect to Counts V-

[14]

and Delaware law require that I evaluate this argument by asking on a claim-by-claim basis whether Walker has pleaded facts with particularity that raise a reasonable doubt as to whether a majority of the directors face a substantial likelihood of liability on the counts.

Counts I and II allege that Campbell, French, and the individual members of the audit committee violated Sections 10(b) and 20(a) of the Exchange Act.  Walker does not allege that any of the directors other than Campbell made any of the statements on which these claims are based.  Thus, Campbell is the only Director Defendant who can be held directly liable as a maker of the statements under Section 10(b).  See Janus Capital

---

VII.  This argument fails both because it is contrary to Delaware law, see Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961, 977 n.48 (Del. Ch. 2003), and because, as I explain below, the complaint fails to plead with particularity that any of the defendants face a substantial likelihood of liability with respect to Counts V-VII.  Walker also recited several boilerplate "interest" arguments that I need not investigate at length.  Namely, Walker attempted to establish that the directors were interested with respect to these counts by noting their interest in retaining their positions and their fear of triggering the "insured v. insured" exclusion in the company's liability insurance policies.  Claims such as these have routinely been rejected as insufficient for the purpose of establishing demand futility.  See In re Limited, Inc., No. CIV.A. 17148-NC, 2002 WL 537692, at *4 (Del. Ch. Mar. 27, 2002); Spector v. Sidhu, No. 3:03-3-CV-0841-H, 2004 WL 350682, at *5 (N.D. Tex. Jan. 26, 2004).

Group, Inc. v. First Derivative Traders, 131 S.Ct. 2296, 2301-02 (2011); SEC v. Tambone, 597 F.3d 436, 447 (1st Cir. 2010).

Although the other Director Defendants could, in theory, face liability as control persons under Section 20(a), the complaint also fails to plead viable Section 20(a) claims against the majority of the directors who were not charged with either making or tacitly approving the statements.   Section 20(a) imposes derivative liability on control persons for violations of the Exchange Act committed by others.   Hill v. Gozani, 638 F.3d 40, 53 (1st Cir. 2011).   Thus, a plaintiff must plead a legally sufficient primary violation of the Exchange Act by a third party to state a viable Section 20(a) claim. Thompson v. RelationServe Media, Inc., 610 F.3d 628, 635-36 (11th Cir. 2010).   Walker's theory is that Campbell and French were primary violators of Section 10(b) because their failure to disclose material adverse information about the backlog made their public statements on the subject misleading.   Compl. ¶¶ 66, 75, 79, 86, 92.   As I recently explained, however, in dismissing a far more detailed securities fraud action based on substantially the same allegedly misleading statements, a securities fraud claim based on the omission of material information must explain why the alleged omissions made what was

[16]

disclosed misleading.  City of Roseville Empl. Ret. Sys. v.
Textron, Inc., No. 09-cv-0367, Doc. No. 82, at 22-25.  Although
Walker alleges that the backlog statements were misleading
because they failed to sufficiently explain the risk that the
backlog could be adversely affected by cancellations or
deferrals, he has done so only in conclusory terms that focus on
the general effect that an economic downturn could have on
airplane and helicopter orders.  This is a risk that does not
require disclosure to be understood by investors and, in any
event, it is a risk that Textron acknowledged in its securities
filing.  Compl. ¶ 52.  Accordingly, Walker has not alleged a
viable Section 20(a) claim against any of the directors because
he has not pleaded a viable primary violation of Section 10(b)
by Campbell and French.

Walker's suggestion that a majority of the directors face a
substantial likelihood of control person liability under Section
20(a) also fails to support his demand futility argument because
he has failed to plead with particularity that the directors who
neither made nor authorized the statements qualify as control
persons.  The SEC has explained that "control" is defined as
"the possession, direct or indirect, of the power to direct or
cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Case law applying Section 20(a) makes clear that the issue of control "is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions". SEC v. Todd, 642 F.3d 1207, 1223 (9th Cir. 2011) (quoting Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir. 1994)).

In the present case, Walker has done nothing to allege that any of the directors other than Campbell and the members of the audit committee had any role in managing Textron's day-to-day affairs other than to merely point to their status as directors. An allegation that a defendant is a member of a corporation's board of directors, however, is insufficient by itself to establish that the director was a control person. Adams v. Kinder Morgan, Inc., 340 F.3d 1083, 1108 (10th Cir. 2003); Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir. 1984); see also Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002) (requiring more than allegations of a "general power to control the company" to establish control person status). Accordingly, Walker has failed to plead with particularity facts that raise a reasonable doubt as to whether a majority of

[18]

Textron's directors face a substantial likelihood of liability
under either Section 10(b) or Section 20(a).

Counts III and IV allege that Campbell, French, and the
individual members of the audit committee violated their
fiduciary duties of loyalty, good faith, and due care by making,
reviewing, or approving the allegedly misleading statements.
Textron's directors cannot face personal liability for due care
violations, however, because the company's charter includes a
provision authorized by Delaware's General Corporation Law that
immunizes prevents directors from facing liability for such
violations.  See Del. Code Ann. tit. 8, § 102(b)(7) (West 2011).
Accordingly, Walker's contention that the company's directors
face a substantial likelihood of liability for breach of
fiduciary duty turns on whether his complaint sufficiently
pleads that the directors violated either the duty of loyalty or
the duty of good faith.

Loyalty is a core fiduciary obligation that directors owe
to the corporation they serve.  Directors may face liability for
breaching the duty of loyalty either by taking personal
advantage of opportunities that rightfully belong to the
corporation, see, e.g., McGowan v. Ferro, 859 A.2d 1012, 1038
(Del. Ch. 2004) (outlining a corporate opportunity claim), or by

[19]

injuring the corporation through actions that are the product of
a conflict of interest, see, e.g., Krasner v. Moffett, 826 A.2d
277, 283 (Del. 2003).  Delaware law also treats good faith as a
subsidiary aspect of the duty of loyalty.  Stone ex rel. AmSouth
Bancorp. v. Ritter, 911 A.2d 362, 370 (Del. 2006).  Thus, an
action that is intended to injure the corporation or that is the
result of a conscious disregard of a known duty breaches the
duty of loyalty because it is not undertaken in good faith.  Id.
For similar reasons, a breach of the duty of loyalty can result
from a failure to oversee or monitor corporate activities, but
only if the directors either "utterly failed to implement any
reporting or information system or controls" or "having
implemented such a system or controls, consciously failed to
monitor or oversee its operations . . . ."  Id.

Walker does not plead with particularity that a majority of
Textron's directors acted from self-interest.  Nor does he plead
any facts that would support a claim that they acted with bad
intentions, intentionally disregarded a known duty, failed to
implement an adequate reporting system, or consciously failed to
oversee the company's activities.[4]  Instead, the complaint merely

---

[4] While Walker alleges in his brief (in purely conclusory terms)
that the company's directors "made a conscious decision to

recites paradigmatic and conclusory allegations, such as that
"[the] defendant directors of Textron authorized and/or
permitted the false statements disseminated directly to the
public or made directly to securities analysts . . . ." Compl.
¶ 115. This and other similar allegations in the complaint
simply do not sufficiently plead that a majority of the
directors were disloyal or otherwise acted in bad faith.
Accordingly, Walker has failed to properly plead that a majority
of the directors face a substantial likelihood of liability for
breach of fiduciary duty under Counts III and IV.

B.   **Counts V-VII - The Stock Repurchase**

Walker bases Counts V-VII on the board's July 19, 2007
authorization of the stock repurchase plan and its later failure
to prevent repurchases under the plan. Count V charges the
Director Defendants with breach of fiduciary duty, and Counts VI
and VII charge all of the defendants with corporate waste and
unjust enrichment. I analyze Walker's demand futility argument

---

refrain from correcting or preventing the issuance of those
misstatements, which they knew or were reckless in not knowing
were correct," Pl.'s Memo. of Law in Opp. to Def.'s M. to
Dismiss the Compl. at 33, he retreated from this position at
oral argument  and stated that his theory of liability was not
based on any allegations that a majority of the directors
intentionally failed to correct the misleading statements.  Mot.
Hr'g Tr. 72-73, Mar. 11, 2011 (Doc. No. 46).

with respect to these claims under both prongs of the *Aronson* test to the extent that the claims are based on the board's decision to approve the stock repurchase plan.  Claims that board members are liable for failing to prevent stock purchases under the plan after French and Campbell made the allegedly misleading statements are governed by the *Rales* test which, as I have explained, recapitulates the first prong of *Aronson*.

### 1.   First Prong of *Aronson*

Walker attempts to satisfy the first prong of *Aronson* with respect to Counts V-VII by again arguing that a majority of the directors were not disinterested because they face a substantial likelihood of liability on these counts.  I disagree.

Obviously, Walker's claim that a majority of the directors face a substantial likelihood of liability with respect to Counts V-VII is stronger than his similar claim with respect to Counts I-IV because Walker has named a majority of the directors as defendants with respect to these counts.  However, a claim of director interest requires more than a mere assertion that a majority of the board would have faced claims for damages if they had authorized the corporation to sue.  See In re Citigroup, 964 A.2d at 121.  Accordingly, I must examine more closely the strength of each of Walker's claims to determine

[22]

whether facts have been pleaded with particularity that raise a reasonable doubt as to whether a majority of the directors face a substantial likelihood of liability on these counts.

      a.   Count V

Walker charges in Count V that the directors violated their fiduciary duty of loyalty and its subsidiary duty of good faith by approving the stock repurchase program "while Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's backlog and business prospects." Compl. ¶ 149.

The complaint, however, contains no allegations that any of the board members other than Campbell received any personal benefit or engaged in any impermissible self-dealing when they approved and implemented the repurchase program. See Aronson, 473 A.2d at 815; Compl. ¶¶ 105-120. Nor has Walker pleaded any particularized facts indicating that the directors otherwise acted in bad faith or in conscious disregard of a known duty. Instead, Walker relies on conclusory statements such as:

> [the Board members] violated and breached their
> fiduciary duties of loyalty, reasonable inquiry,
> oversight, good faith and supervision by knowingly or
> recklessly authorizing or failing to halt the
> repurchase of shares while Textron's share price was
> artificially inflated as a result of false and

[23]

>misleading statements regarding Textron's backlog and
>business prospects.

Id. ¶ 149.

Because nothing in Walker's complaint could be
characterized as a particularized factual allegation that the
directors other than Campbell were in any way disloyal or acted
in bad faith, I cannot say that a majority of the directors face
a substantial likelihood of liability for breach of fiduciary
duty either for approving the stock repurchase plan or for
failing to prevent repurchases under the plan.

>b.   Count VI

Walker claims in Count VI that the Director Defendants
"wasted corporate assets by: directing Textron to repurchase
over $608 million of its own stock at artificially inflated
prices, including $342 million shares repurchased during the
third fiscal quarter . . . ." Id. ¶ 154.

Waste claims are most often associated "with a transfer of
corporate assets that serves no corporate purpose; or for which
no consideration at all is received." Brehm v. Eisner, 746 A.2d
244, 263 (Del. 2000) (quoting Lewis v. Vogelstein, 699 A.2d 327,
336 (Del. Ch. 1997)). Accordingly, a claim of waste must plead
facts showing "an exchange that is so one sided that no business

[24]

person of ordinary sound judgment could conclude that the corporation has received adequate consideration." Id. (quoting In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 362 (Del. Ch. 1998)).  In order to meet this stringent test, Walker "must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." White v. Panic, 783 A.2d 543, 554 n.36 (Del. 2001).

Walker's complaint does not allege any facts sufficient to meet this standard.  Walker does not claim that Textron ever paid more than the prevailing market price for its shares, nor does Walker provide particularized factual allegations that would indicate that a majority of the board knew at any time that Textron's stock price was artificially inflated. See In re Am. Int'l Group, 700 F.Supp.2d at 440 (finding that plaintiff had failed to plead demand futility with respect to waste claim where the complaint contained no "particularized facts indicating that the Board consciously acted in bad faith when deciding . . . to repurchase shares").  Instead, Walker relies on conclusory allegations such as, "[t]he Board knowingly or recklessly authorized the repurchase of shares while Textron's

[25]

share price was artificially inflated as a result of false and misleading statements . . . ." Compl. ¶ 113. Such allegations are insufficient to raise a reasonable doubt as to whether a majority of the directors face a substantial likelihood of liability with respect to Count VI.

        c.   Count VII

Count VII asserts a claim for unjust enrichment. Walker alleges that a majority of the directors "were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Textron." Compl. ¶ 159. "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience." Jackson Nat. Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del. Ch. 1999) (internal quotations omitted). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." Id.

Walker has not alleged with particularity that a majority of the directors face a substantial likelihood of liability for

[26]

unjust enrichment.  Most notably, Walker has failed to plead
facts that would allow me to infer that a majority of the
directors were "enriched" as a result of their approval of the
stock repurchase plan.  None of the directors are alleged to
have sold stock to the company as part of the repurchase plan.[5]
Instead, Walker asserts that the directors were "enriched"
through their compensation as directors.  The payments that the
directors received for their service to Textron, however, do not
correlate with the alleged "impoverishment" that occurred when
Textron repurchased its stock.  Therefore, Walker has failed to
show a relationship between the enrichment and the
impoverishment.  See id.

### 2.   The Second Prong of *Aronson*

The second prong of the Aronson test essentially asks
"whether plaintiffs have alleged particularized facts creating a
reasonable doubt that the actions of the defendant were
protected by the business judgment rule."  Brehm, 746 A.2d at
255.  As the leading treatise on the subject notes, "[f]our
elements define the business judgment rule presumption: (1) a
business decision; (2) disinterestedness and independence; (3)

---

[5] Walker does allege that Campbell sold stock during the
repurchase period, but it is not alleged that he sold it to
Textron as part of the repurchase program.

[27]

due care; and (4) good faith."   1 Stephen A. Radin, The Business

Judgment Rule 86 (6th ed. 2009) (quoting Roselink Investors,

L.L.C. v. Shenkman, 386 F.Supp.2d 209, 216 (S.D.N.Y. 2004)).

     As I have explained, Walker does not claim that a majority

of the directors lacked independence, and he has not pleaded

facts with particularity that would support a claim that the

directors were interested or failed to act in good faith when

they approved the stock repurchase plan.   Thus, the only reason

why their decision to approve the plan might be unprotected by

the business judgment rule would be if they failed to act with

due care.[6]

_____

[6] The Delaware Chancery Court has explained that the second prong
of Aronson operates as a "safety valve" that excuses the demand
requirement even when a majority of the board is deemed to be
disinterested and independent under Aronson's first prong.
Guttman v. Huang, 823 A.2d 492, 500 (Del. Ch. 2003).   In a case
like the present one, however, where the plaintiff argues that a
demand will be futile because the directors face a substantial
likelihood of liability, little is achieved by asking whether
the complaint pleads with particularity that the board failed to
comply with the Business Judgment Rule, because the court will
have examined the sufficiency of the pleadings under Aronson's
first prong and found them wanting regardless of whether the
director's actions are protected by the rule.   In other words, a
determination that a complaint pleads a breach of the business
judgment rule with particularity tells us little about the
potential merit of a claim that the plaintiff has failed to
plead with particularity for other reasons.   Nevertheless,
because Delaware's courts have applied both prongs of Aronson to
cases in which the claims under review did not plead a
substantial likelihood of director liability with particularity,

A director's duty of due care entails only a procedural obligation to exercise due care.  Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985); Brehm, 746 A.2d at 264.  When a due care claim is premised on an assertion that the board failed to make an informed decision, "[t]he standard for determining whether a business judgment reached by a board of directors was an informed one is gross negligence."  Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 66 (Del. 1989) (internal quotations omitted).  Gross negligence, in turn, is "conduct that constitutes reckless indifference or actions that are without the bounds of reason."  McPadden v. Sidhu, 964 A.2d 1262, 1274 (Del. Ch. 2008).

Walker claims that the Textron board did not exercise due care when it approved the stock repurchase plan because the board authorized the plan "in the face of widely predicted economic downturn" while "Textron's share price was artificially inflated as a result of false and misleading statements regarding Textron's backlog and business prospects."  Compl. ¶

---

see, e.g., McPadden v. Sidhu, 964 A.2d 1262, 1274-75 (Del. Ch. 2008) (finding an exculpated due care claim excused from demand requirement under the second prong of Aronson), I examine Walker's claims to determine whether they plead with particularity that the directors failed to exercise due care when they approved the stock repurchase plan.

113; Pl.'s Memo. of Law in Opp. to Def.'s Mot. to Dismiss the Compl. at 30. Other than these conclusory allegations, however, nothing in the complaint suggests that the directors were not adequately informed when they approved the repurchase plan.

Absent from Walker's complaint are particularized factual allegations that the "board failed to put in the time and effort necessary to properly evaluate the risks and benefits" of the stock repurchase or "allegations that the board was unaware of the material terms of the transaction or failed to obtain the advice of experts before approving it." In re Dow Chem. Co. Derivative Litig., No. 4349-CC, 2010 WL 66769, at *9 (Del. Ch. Jan. 11, 2010). Instead, Walker relies on hindsight to implicate the board's decision-making process. Such allegations are simply insufficient to support a claim that the board failed to adequately inform itself about the plan before approving it. See Brehm, 746 A.2d at 260; In re Citigroup, 964 A.2d at 124. Because Walker has failed to plead particularized facts indicating that the Textron board was not adequately informed when it voted to approve the stock repurchase plan, I cannot say that its approval of the plan was not a valid exercise of the board's business judgment. Therefore, Walker has failed to

[30]

plead sufficient facts to satisfy the second prong of <u>Aronson</u> with respect to Counts V-VII.

### IV.   CONCLUSION

For the forgoing reasons, the Defendants' Motion to Dismiss the Complaint (Doc. No. 29) is granted.  The clerk shall enter judgment in accordance with this Memorandum and Order and close the case.

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge
Sitting by Designation

September 13, 2011

cc:  Counsel of Record

[31]